Dale Freemond DAY *v.* STATE of Arkansas

CR 91-94                                        816 S.W.2d 852

Supreme Court of Arkansas
Opinion delivered September 30, 1991

*Denny Hyslip*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. Dale Freemond Day, the appellant, was convicted of battery in the first degree and murder in the first degree, and sentenced to ten and forty years imprisonment, respectively. The sentences are to run concurrently.

Day now seeks reversal of his convictions, alleging that the trial court erred; 1) in admitting two photographs of the murder victim into evidence; 2) in refusing to sever the battery and murder offenses; 3) in refusing to grant funds for a private psychiatric evaluation; and 4) in allowing the admission of Day's statements into evidence. We disagree with all four arguments and affirm.

The facts at trial were presented primarily through the testimony of the battery victim, the investigating officers, and Day, himself.

On the evening of March 3, 1990, Day, who had been residing in Minnesota, arrived at the home of his estranged wife, Victoria Day, in West Fork, Arkansas. Finding no one there, Day entered one of the bedrooms and eventually fell asleep. He awoke to the sound of the television and realized that Victoria and her uncle, James Woodring, with whom she had been having an affair, were in the living room watching a T.V. program. Victoria shortly thereafter entered the bedroom, whereupon Day struck her repeatedly with the butt of a shotgun, breaking both of her hands. Day then went into the living room and hit Mr. Woodring with the shotgun. Mr. Woodring had been asleep on the couch

and when he attempted to rise, Day shot him. Day shot Mr. Woodring twice more as Mr. Woodring attempted to leave the house through the front door. The victim got as far as the driveway before he collapsed and died. Day asked Victoria for her car keys and drove Victoria's car to a nearby convenience store where he had parked his own car earlier. Day exchanged cars, drove to the sheriff's department, and turned himself in at approximately 2:45 a.m. on March 4.

## I. ADMISSION OF PHOTOGRAPHS

Day first contends the trial court erred in admitting into evidence two photographs, State's exhibits 3 and 4, depicting James Woodring's body after the shooting. Day asserts the pictures were overly gruesome and inflamatory and that the probative value of the pictures was outweighed by their prejudicial effect. We do not agree.

Testimony at trial established that Mr. Woodring had been asleep prior to Day's assault and that he ran out of the house, barefoot, to escape from Day. State's Exhibit 3 showed that Mr. Woodring was shoeless, and Exhibit 4 showed where Mr. Woodring had fallen in proximity to the house. They were the only photographs of the crime scene admitted into evidence.

Even inflamatory photographs can be admitted if they shed light on any issue or are helpful to the jury. *Strawhacker* v. *State*, 304 Ark. 726, 804 S.W.2d 720 (1991). The admission of such evidence lies within the discretion of the trial court, and we will not reverse, absent an abuse of that discretion. *Morris* v. *State*, 302 Ark. 532, 792 S.W.2d 288 (1990). We find no such abuse here.

## II. SEVERANCE OF OFFENSES

Day next argues that the trial court erred in denying his pretrial motion to sever the first degree battery charge and the first degree murder charge.

In addition to the battery and murder offenses, Day was charged with felon in possession of a firearm. The trial court severed this offense, but held that the battery and murder charges should be tried together as they were "part of the res gestae."

Ark. R. Crim. P. 21.1 provides:

> Two (2) or more offenses may be joined in one (1) information or indictment with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:
>
>> (a) are of the same or similar character, even if not part of a single scheme or plan; or
>>
>> (b) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

A trial court's decision to deny a motion for severance is discretionary, and two or more criminal offenses are based "on a series of acts connected together" when the offenses occurred close together in time and place. *Gillie* v. *State*, 305 Ark. 296, 808 S.W.2d 320 (1991) (citing *Brown* v. *State*, 304 Ark. 98, 800 S.W.2d 424 (1990)).

Here, Day's assault on Victoria Day occurred only minutes before Day shot and killed James Woodring, who was present in the next room. Furthermore, Day's distress and jealousy over his wife's affair with Mr. Woodring can fairly be characterized as the "single scheme or plan" which prompted him to commit the offenses. The court was correct in not severing the charges.

## III. *PSYCHIATRIC EVALUATION*

Citing *Ake* v. *Oklahoma*, 470 U.S. 68 (1985), Day next claims the trial court erred in refusing to grant his request for a private psychiatric evaluation in order to determine his competency to stand trial. *Ake* provides in pertinent part:

> . . .[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83. Day's claim is without merit. In the first place, an examination of the record reflects that Day did not demonstrate

to the trial judge that his present competence or his sanity at the time of the offenses would be a significant factor at trial. The trial court, as a cautionary measure, ordered psychiatric evaluation of Day by Dr. Travis Jenkins of the Ozark Guidance Center. Dr. Jenkins reported that Day was competent to stand trial and that there was "no evidence to suggest that he was psychotic at the time of the alleged offenses. . .", or during Dr. Jenkins' interview with him.

As a result of Dr. Jenkins' report, Day filed a motion to appoint a private psychiatrist, claiming that since he had some difficulty with anxiety, depression, and behavioral problems, he was entitled to the opinion of a "private employed expert." In denying Day's motion, the trial court noted that Dr. Jenkins' report reflected that "any evidence of anxiety, depression or behavioral problems were not pertinent to [Day's] psychiatric assessment around the time of the alleged offenses," and that "he had been afforded an evaluation at [the] Ozark Guidance Center by a duly licensed and qualified psychiatrist. . ."

■ We have repeatedly held that a defendant's right to examination under *Ake* is protected by an examination by the state hospital. *Wainwright* v. *State*, 302 Ark. 371, 790 S.W.2d 420 (1990); *Branscomb* v. *State*, 299 Ark. 482, 774 S.W.2d 426 (1989). So, even if Day was entitled to an examination, his evaluation at the Ozark Guidance Center is equivalent to examination by the State Hospital. We find no fault in the trial court's rulings.

## IV. *ADMISSION OF STATEMENTS*

Lastly, Day argues that the trial court erred in allowing into evidence the oral and written statements he made to the police.

Day filed a pretrial motion to suppress all oral and written statements, alleging they were obtained in violation of his privilege against self-incrimination and right to counsel. A suppression hearing was held in which the State called the two officers present when the statements were made. Officer Seigle Bell, an investigator with the Washington County Sheriff's Department, was on duty at the Sheriff's office when Day turned himself in in the early morning hours of March 4. Officer Bell testified that Day came into the dispatch room with Corporal

Leroy Johnson, who pointed to Day and stated, "I think this is the man you're looking for." (Officer Bell testified that he had previously received a report of a possible homicide which named the appellant as a suspect.) Day stated his name, and Officer Bell asked him to place his hands against the wall while he proceeded to pat Day down for weapons. At that point, Day remarked: "The gun is in my car. It's parked outside." Officer Bell immediately escorted Day to the waiting room and advised him of his *Miranda* rights.

Day challenges the admission of this initial statement on the grounds that his entrance to the Sheriff's office placed him in a custodial situation and that he should have been "mirandized" before he uttered the incriminating information. We agree with the trial court, however, that the statement was admissible as a spontaneous utterance.

In determining whether statements are admissible, we evaluate the totality of the circumstances and reverse only if the trial court's finding is clearly against the preponderance of the evidence. *Walker v. State*, 303 Ark. 401, 797 S.W.2d 447 (1990). The statement was made within minutes of Day's arrival at the station, and there is no evidence that Day was coerced or induced into speaking. Officer Bell's decision to frisk Day first for weapons was appropriate under the circumstances and did not constitute the type of "custodial interrogation" for which the *Miranda* warnings were designed. We have held many times that a suspect's spontaneous statements, although made in police custody and prior to *Miranda* warnings, are admissible against him. See *Futch v. State*, 288 Ark. 323, 705 S.W.2d 11 (1986); *Ward v. State*, 272 Ark. 99, 612 S.W.2d 115 (1981).

The other admitted statements to which Day objects occurred after he was twice issued the *Miranda* warnings. In the first instance, Officer Bell testified that he read each sentence from the standard form used in the department and wrote down Day's response. Day then reviewed and initialed the form, indicating that he understood his rights.

Following this procedure, Officer Bell and Day entered Officer Bell's office and sat down with a cup of coffee, at which point Day began talking about the incident, implicating himself in both the battery and murder offenses. Officer Bell testified that

he advised Day to wait until Captain O'Kelly arrived, before talking, but Day insisted on continuing.

When Day completed his story, Officer Bell told him that he was going to write out a statement from his notes and have Day sign it. Day then stated, "Well, before I sign anything, I probably better talk to a lawyer."

Captain O'Kelly testified that when he arrived, Officer Bell briefed him concerning Day's statement and informed him that Day wished to speak with an attorney before proceeding further. In the presence of Officer Bell, Captain O'Kelly again advised Day of his *Miranda* rights, and Day executed a second statement of rights form. Captain O'Kelly then informed Day that he knew of Day's request for counsel and asked Day whether he wanted him to contact a lawyer, to which Day responded that Officer Bell had been mistaken about his request and that he only wanted a lawyer prior to going to court. Captain O'Kelly testified that Day "wanted to tell him what happened." Day allowed Captain O'Kelly to make written notes of his statement, at the end of which he added his signature.

■ As to Day's oral statement to Officer Bell, Day merely argues that this statement is inadmissible since it was "tainted" by the first oral statement. This argument is meritless as the first statement was a spontaneous utterance.

■ Furthermore, again reviewing the totality of the circumstances, there is no evidence that Day (a repeat offender with five previous convictions) was not fully aware of his rights. Officer Bell testified that Day appeared sober and reasonable and clearly indicated that he understood the rights read to him. Once Day received and understood the *Miranda* warnings administered to him but, nonetheless, insisted on talking to Officer Bell, he waived those rights.

■ With regard to the statement made to Captain O'Kelly, Day contends that it, too, was tainted and also, that when he informed Officer Bell he wanted an attorney, all interrogation should have ceased. The trial court ruled that Day effectively recanted this request when he informed Captain O'Kelly that Officer Bell had been wrong about his desire for counsel, and that he wanted to talk. In addition, the trial court noted that there was

a serious question as to whether Day actually asserted his right to counsel. In either event, the trial court was correct.

Professors LaFave and Israel state in *Criminal Procedure*, Vol. 1, § 6.9 (1984 and Supp. 1991), "there is much to be said for the conclusion some courts have reached: 'where a suspect makes an equivocal assertion of counsel, the police must cease all questioning, except that they may attempt to clarify the suspect's desire for counsel.' " (Citing *Towne* v. *Dugger*, 899 F.2d 1104 (11th Cir. 1990)). *See also United States* v. *Fouche*, 776 F.2d 1398 (9th Cir. 1985). Here, Day's comment that he wanted to talk to a lawyer "before I sign anything" constitutes the type of "equivocal" assertion to which Professors LaFave and Israel are referring, and should not preclude further questioning to clarify the matter. *See* Criminal Procedure, supp. 1991 at 132.

We do not agree with Day that Captain O'Kelly's dialogue with him following his announcement that he would like to talk with counsel before signing anything amounted to "interrogation." Captain O'Kelly was merely clarifying Day's request and took no action to elicit incriminating information. Even if we found that Day properly invoked his right to counsel, his statement still became admissible evidence since it was he, and not the police, who initiated further discussion of the evening's events. *See Bussard* v. *State*, 295 Ark. 72, 747 S.W.2d 71 (1988).

For the foregoing reasons, we affirm.