Samuel DUNCAN *v.* STATE of Arkansas

CR 90-177                                    831 S.W.2d 115

Supreme Court of Arkansas
Opinion delivered May 4, 1992

*Jeff Rosenzweig*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Olan W. Reeves*, and *Jeff Vining*, Asst. Att'ys Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Samuel Duncan, was charged with capital felony murder in the shooting death of Pine Bluff police officer John Fallis on March 4, 1985. At Duncan's first trial, he was convicted and sentenced to death by lethal injection. We reversed and remanded on the basis that his confession was inadmissible for two reasons: 1) the lack of an effective waiver of his rights, and 2) the State's failure to bring him before a magistrate for a prompt first appearance pursuant to A.R.Cr.P. Rule 8.1. *Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987).

On July 25, 1990, as the result of Duncan's second trial, he was again convicted of capital felony murder and sentenced to death by lethal injection.

Now on appeal, Duncan asserts thirteen points of error: 1) the trial court erred in holding that he could be impeached with his prior confessions, 2) the trial court erred in refusing to dismiss this case on due process grounds because of the State's use of perjured testimony, 3) Duncan was denied his right to only non-racial grounds for exclusion of blacks from the jury, 4) the trial court erred in permitting testimony that a warrant had been issued for Duncan in the State of Washington, 5) the entire

prosecutor's office should have been disqualified, 6) the use of his convictions in the State of Washington, on appeal as of this date, taints the penalty phase verdict and will mandate resentencing upon favorable action in the State of Washington, 7) the trial court erred in refusing his submission of a mitigating circumstance, 8) the trial court erred in refusing to require weighing of aggravating and mitigating circumstances in Form 3, Question C, 9) the trial court refused to submit an instruction indicating that the statute is not mandatory, 10) principles of comparative review require reduction of this death sentence, 11) the prosecutor wrongly had final closing argument in the penalty phase, 12) the trial court erred in its refusal to read part of an instruction, and 13) *Engle* v. *Isaac*, 456 U.S. 107 (1982), issues.

We find that Duncan's first point of error requires us to reverse and remand.

Duncan claims that the trial court erred in holding that he could be impeached with his prior confession thereby preventing him from testifying at trial. As an initial matter, the State contends that this issue was not preserved for appeal; we have examined the record and are satisfied that the issue of the voluntariness of Duncan's confession was brought to the trial court's attention as a basis for its ruling allowing the confession to be used for impeachment purposes.

The underlying facts of our decision in Duncan's first appeal are compelling and we set them out as follows:

> A chronology of the less disputed events surrounding Duncan's confession begins at about noon on the day after the shooting. Duncan was arrested at his residence in Grady, Arkansas, and taken to the Pine Bluff police station. Shortly thereafter and prior to any interrogation, the prosecuting attorney, Wayne Matthews, filed a felony murder information against Duncan. In mid-afternoon the police began their interrogation of Duncan. Present during this interview were two Pine Bluff police officers, the prosecuting attorney, and a deputy prosecuting attorney. No careful inquiry into Duncan's reading and comprehension proficiency was made. While Duncan testified he dropped out of school at the eleventh grade, a psychologist testified at the suppression hearing that he read at a third

grade level and had an IQ of 70 which he classified as being mildly retarded.

Duncan's rights were read to him and after he was told he had a right to have an attorney present before making any statement, he asked, "Do ya'll appoint lawyers?" The officer did not answer the question directly but continued reading the Miranda rights form.

There is no evidence in the record of any rights waiver form being signed, nor was Duncan asked at any time whether in addition to understanding his rights he also agreed to waive them. Duncan did sign the rights form, misspelling his name in the process (D-U-N-A-N).

The officers proceeded with the interrogation of Duncan for approximately two and one-half hours, failing to get anything but exculpatory information from him. He was taken to his cell and kept there until late Friday night when he was returned to an interrogation room. He was not allowed to make any phone calls during this three and a half day period. Late Friday night he was again interrogated and at this time gave incriminating information, admitting he had shot the officer.

The next day, Saturday, Duncan was allowed to see his girlfriend, also in custody, for a brief period, but was allowed no other visitors or phone calls. On Sunday, the officers asked appellant to give his confession again, and this time it was videotaped. The court found both the Friday and Sunday confession admissible, but only the Sunday confession was introduced at trial.

*Duncan v. State, supra.*

In addressing the merits of this first point of error, we note that in *Mincey v. Arizona*, 437 U.S. 385 (1978), the United States Supreme Court held that statements obtained from the defendant in that case at the hospital, used to impeach his credibility, were inadmissible because they had not been made voluntarily. The Court stated:

Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona, supra*, are

> admissible for impeachment if their 'trustworthiness . . . satisfies legal standards.' But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.' If, therefore, Mincey's statements to Detective Hust were not 'the product of a rational intellect and free will,' his conviction cannot stand. In making this critical determination, . . . this Court is under a duty to make an independent evaluation of the record.

(Citations omitted.)

■■ In the recent case of *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992), we carefully examined the question of voluntariness of a confession while in custody, noting that this is a federal issue involving fifth, sixth, and fourteenth amendment rights. Our analysis in that case is poignant and equally applicable to this case.

> In *Miranda* v. *Arizona*, 384 U.S. 436, 467 (1966), the Court recognized that custodial interrogation inherently produces 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' To neutralize this inherent compulsion and give true meaning to the Fifth Amendment privilege against self-incrimination, the Court in *Miranda* imposed a clear standard for police to follow in dealing with an accused. Before questioning an accused, the police must fully apprise the suspect of the State's intention to use his statements to secure a conviction and must inform him of his rights to remain silent and to have counsel, if he desires. *Id.* at 468-70. A waiver of these rights is valid only if it is made 'voluntarily, knowingly and intelligently.' *Id.* at 444. An incriminating statement obtained on the basis of a waiver must be excluded unless the State establishes to the satisfaction of the trial court by a preponderance of the evidence that the waiver was voluntarily, knowingly, and intelligently given. *Colorado* v. *Connelly*, 479 U.S. 157, 168 (1986).

> The inquiry into waiver has two distinct dimensions. *Colorado* v. *Spring*, 479 U.S. 564 (1987); *Moran* v.

*Burbine*, 475 U.S. 412 (1986). 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' *Moran* at 421. 'Involuntary confession' jurisprudence is concerned with governmental intimidation, coercion, or deception. *Colorado* v. *Connelly*, 479 U.S. 157 (1986). Such governmental overreaching is not at issue in this case, and we do not discuss it further.

'Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' *Moran* at 421. In *Colorado* v. *Spring, supra*, the Court wrote:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Moran* v. *Burbine, supra*, at 422; *Oregon* v. *Elstad, supra*, at 316-17. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

'Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' *Moran* at 421 (citing *Fare* v. *Michael C.*, 442 U.S. 707, 725 (1979)). The 'totality of the circumstances' appellate review mandates inquiry into an evaluation of 'age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and

the consequences of waiving those rights.' *Fare* at 725. Thus, a court must look at the totality of the circumstances to see if the State proved that a defendant had the requisite level of comprehension to waive his Fifth and Sixth Amendment rights.

In this case, the trial court did not address the questions of a knowing or intelligent waiver, government intimidation, or coercion but, rather, determined the issue of voluntariness by allowing the use of the confessions for impeachment purposes. Obviously, portions of our opinion in *Duncan v. State, supra*, were overlooked.

Although we did not expressly declare Duncan's confession to have been made involuntarily, we implied as much by noting the following in *Duncan v. State, supra*:

> . . . Duncan was barely literate and marginally retarded. He was not given a waiver form to sign nor was he asked whether he waived his rights; he was kept incommunicado for three and a half days, and it was only at the end of that time that he gave an inculpatory statement. *There was no showing of a deliberate and intentional relinquishment of his rights, or that he had a clear understanding of what those rights were.*

(Emphasis added.)

██  Given these circumstances, we see no need to further embellish the underlying facts as to whether or not Duncan's waiver was made with a full awareness of both the nature of the right being abandoned and the consequences of his decision to abandon. It was not, and, as a result, we cannot say that his confession was voluntary. In addition, the totality of the circumstances surrounding the interrogation of Duncan reveals governmental intimidation and coercion. For example, the following exchange occurred among the police officers and Duncan:

Officer Hurd:  You going to ride that till you're . . . to the electric chair?

*            *            *            *

Prosecutor Matthews:  Yeah. Especially somebody that got a good chance of going to the electric chair. Like you. Is

that right?

    \*       \*       \*       \*

Prosecutor Matthews:   Reckon that's enough to keep you out of the electric chair, Samuel?

    \*       \*       \*       \*

Officer Cook:   Yes. We know exactly what you had on last night. And the only difference that orange's going to be, it's going to turn white before long.

    \*       \*       \*       \*

I want you to think about this. What kind of clothes you want to be buried in?

    \*       \*       \*       \*

You want to be buried in a suit or a yellow, orange, white uniform?

    \*       \*       \*       \*

Officer Hurd:   Looks like it boils down to a choice . . . whether you want to spend the rest of your life in the pen or do you want to fry in the electric chair.

Duncan:   Sir . . .

Officer Cook:   That's the only choice you got.

Duncan:   . . .sir, I don't want to do neither one of them.

Officer Hurd:   You going to do one of them.

Officer Cook:   One of the other you're going to do.

Officer Hurd:   One or the other.

Officer Cook:   One of the other you're going to do. That's a fact. That's as sure as that thing's sitting right there.

    \*       \*       \*       \*

. . . let me tell you . . . let me tell you one thing. I watched that man die. If I'd of got there 30 seconds late . . . sooner I'd of killed your ass right on the spot.

Duncan:   Sir, I did not do that, sir. I did not do . . . . .

Officer Cook:  I sat there and watched that man die.

Duncan:  Sir, I didn't do that. Sir, could you give me another cigarette in here, please?

Officer Cook:  Sorry.

Duncan:  Okay, sir. Could you give me one, sir?

Officer Hurd:  I wouldn't give you the sweat off my balls.

Because of such governmental overreaching, we again cannot say that Duncan's waiver of his constitutional rights was the product of a free and deliberate choice, rather than governmental intimidation and coercion.

Consequently, the trial court erred in ruling that Duncan's confession, although inadmissible, could still be used to impeach him at trial.

■ Duncan makes numerous other assignments of trial error, none of which have merit, and we address only those which might arise upon retrial. He argues that the trial court erred in permitting testimony that a warrant had been issued for him in the State of Washington. However, he cites no authority or convincing argument in support of his claim, and we will not consider it. *See Ray* v. *State*, 304 Ark. 489, 803 S.W.2d 894 (1991).

■ He also argues that the trial court erred in refusing his submission of a mitigating circumstance. The United States Supreme Court has rejected this residual doubt mitigation circumstance in *Franklin* v. *Lynaugh*, 488 U.S. 935 (1988).

■ Finally, Duncan asserts that the trial court erred in refusing to require weighing of aggravating and mitigating circumstances in Form 3, Question C, which was proffered as follows: "(c) (   ) The aggravating circumstances, when weighed against the mitigating circumstances, justify beyond a reasonable doubt a sentence of death." We have previously addressed and rejected this argument in *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990).

We have also examined the other points of error, and the potential for these same points arising at a later time is highly problematical; we see no need to provide comment for the purpose

of remand.

Pursuant to Ark. Sup. Ct. R. 11(f), we have reviewed all other rulings adverse to Duncan and find that none constitute prejudicial error.

The judgment is reversed, and the case is remanded.

HAYS and GLAZE, JJ., dissent.

STEELE HAYS, Justice, dissenting. The first *Duncan* decision [*Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987)] (*Duncan* I) was overturned because the state failed to bring Duncan before a magistrate without unnecessary delay. Ark. R. Crim. P. 8.1. We found a connection between the delay of three and one-half days and Duncan's custodial statement which rendered the statement useless as evidence. That holding made it unnecessary to decide whether the statement, which was not shown to be the product of an extended interrogation, was voluntarily given. In other words, the error which necessitated the reversal of the first case was the state's failure to pursue a timely arraignment and holding Duncan incommunicado for three and one-half days.

Now the majority holds that the trial court erred in ruling that if Duncan had testified at his second trial his custodial statement could have been used for purposes of impeachment. That ruling was correct, unless it is shown that the statements were not the product of a free and voluntary act on Duncan's part. *Mincey* v. *Arizona*, 437 U.S. 385 (1978); *Hendrickson* v. *State*, 290 Ark. 319, 719 S.W.2d 420 (1986).

But the majority has made no serious attempt to examine the evidence on that score. It quotes two excerpts from the opinion in *Duncan* I, neither of which is particularly pertinent to the issue now before us. One of the quoted excerpts was made in reference to whether Duncan had made a knowledgeable waiver of his Sixth Amendment right to counsel. The other was in reference to the Rule 8.1 issue. What is important, I submit, is not how an appellate opinion generally characterizes the record for purposes of resolving issues of a *previous* appeal, but what in the record *now before us* weighs pro and con on whether the trial court clearly erred in determining that statements by Duncan were given voluntarily. Under our many cases we will not reverse the

trial court in these matters unless the ruling is shown to be clearly erroneous. *Stone* v. *State*, 290 Ark. 204, 718 S.W.2d 102 (1986). All the majority opinion provides are segments of Duncan's interrogation on Tuesday, March 5, the day of his arrest. Admittedly these segments do not show the participants in their best light, but let it be noted that these selective and disjointed excerpts, consisting of barely a page of the opinion, are lifted from a transcript comprising sixty-five pages of questions and answers between Duncan and the officers. A fuller treatment would reflect far more objectively a striking scenario of evasive answers and the increasing frustration reflected in the questions as the hour grew late. Nor does the fact that the idiom of the interrogation room is at times indistinguishable from that of the locker room translate per se into involition. Two points are overlooked by the majority: The questioning did not produce anything inculpatory and although Duncan was told he could terminate the questioning at any time, not once during that span of two and one-half hours did he indicate directly or indirectly that he wanted the questioning to cease. The evident fact is, he hoped to convince the officers he was job hunting in Star City at the time of the homicide. The point to be made is that the trial court decided an issue of credibility after listening to two days of witnesses, and held Duncan's statements were subject to use for purpose of impeachment. Neither the appellant nor the majority has shown that ruling to be clearly erroneous.

GLAZE, J., joins in this dissent.