Don William DAVIS *v.* STATE of Arkansas

CR 92-1385                                863 S.W.2d 259

Supreme Court of Arkansas
Opinion delivered October 4, 1993
[Rehearing denied November 8, 1993.]

*Tim R. Morris*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Don William Davis, was charged and convicted of the capital murder of Jane Daniel, burglary and theft of property. He was sentenced to death by lethal injection on the capital murder charge and given two forty-year sentences and two $15,000 fines on the burglary and theft of property charges. On appeal, Davis assigns to us the following issues for consideration: sufficiency of the evidence; whether the trial court erred in not granting funds for an independent ballistics expert, sociologist, and psychiatric expert; and whether the trial court erred in not granting a mistrial or an admonishment to the jury when the prosecutor made allegedly prejudicial comments in his closing argument. We affirm the trial court.

The facts before us are these: Sharon Haley, who with her husband Mike were also victims of a burglary and neighbors of the murder victim, testified that at about 4:15 p.m. on October 12, 1990, she returned home and found that her screen door was taped open and the wooden door between the garage and the kitchen standing open. When she entered the house, she noticed that a hand gun that had previously been on the bed table was gone and that a console television was pulled away from the wall and the wires disconnected. Fearful, she called the 911 emergency number from the garage phone and went to a neighbor's house.

Once the police arrived, they asked her to take an inventory of her property. She noted the following items missing:

> several guns and appliances, a videocassette recorder, a large Sharp convection/microwave, a thirteen inch Sharp television set, both of her jewelry boxes, an Amish quilt, an older model Realistic brand stereo component set, her wedding ring, antique locket, a small gold chain, a couple of ladies watches, a Mickey Mouse watch, diamond earrings, a set of sapphire earrings, pearls, pearl earrings,

and a couple of costume black onyx earrings; her husband's two high school class rings and one college rings; a cluster ring with pearls and rubies missing, a couple of silver rings with turquoise stones and a matching silver bracelet; silver herringbone chain; while gold ring with a pink zircon; costume choker; tools from the garage; a crossbow; her husband's collection of Harley-Davidson t-shirts & leather jacket; Yankee and Penn State t-shirts; special run bottle of Wild Turkey liquor wrapped in a wooden box; and a bottle of Crown Royal.

Mike Haley testified concerning the many firearms and weapons stolen from their home during the burglary. His list included: a 410 shotgun, a .22 rifle, Marlin Model 39-A, with a banner scope, a Ruger M-77 6 mm deer rifle, a Stevens double barrel shotgun, a .44 magnum pistol with a scope and a Winchester Model 50, 20 gauge shotgun. Also missing were a crossbow and crossbow arrows as well as numerous types of ammunition for the firearms.

At about 10:00 p.m., the same day as the Haley burglary, the Haleys' neighbor, Richard Daniel, returned home from a business trip and noticed the door of his garage into the kitchen hallway was open. As he entered the house, he saw a rice pan and bowl out in the kitchen, and it startled him when he noticed a Kool cigarette butt in the rice bowl (especially since neither he nor his wife smoked). Noting that the storeroom door was ajar, he entered to find his wife, Jane, lying on the floor in a pool of blood. She was lying with her head face down in a cardboard box towards the wall, obviously, dead. Like Mrs. Haley, Mr. Daniel called 911 for help.

Police attempted to trace Mrs. Daniel's activities during the day. An employee of the Rogers Diagnostic Clinic testified that the victim came into the clinic around lunchtime to get a flu shot. Mrs. Daniel's beautician, Gaye Tarron, testified that Mrs. Daniel had a standing appointment every Friday at 2:30 p.m. and had never skipped an appointment without calling first. On October 12, 1990, for the first time in ten years, Mrs. Daniel missed her appointment and did not call.

About two weeks after his wife's death, Daniel and his daughter searched the house for missing items. They found that

an expensive Lucien Piccard watch was gone as well as a couple of pearl necklaces, a gold rope necklace, and a matching gold necklace and bracelet. Also missing were a jewelry bag and a Nikon camera.

At the time of the murder, the appellant, Don Davis, was living with three roommates in a house in Bentonville. One of the roommates, Renee Davis, testified that during the time they were living together, Don Davis had been bringing stolen merchandise home. On the day of the murder, the appellant had come home sometime between 1:00 and 2:00 p.m. acting frightened, according to his roommates, telling his girlfriend and roommate, Susan Ferguson, that "somebody got hurt." Property seen in his possession that day included a Realistic stereo, a number of guns, a black motorcycle jacket, a videocassette recorder, a television, a microwave, numerous t-shirts, and tools. Later that day the appellant allegedly admitted to Renee and Susan that "somebody had gotten killed" but emphasized that he did not do it claiming that he had been next door when the murder occurred. He said that he "didn't know why he shot her, she was cooperating." Among the many items of property Davis had in the car was a gun covered by a white towel. He told Renee that if she touched the "towel it would be her death sentence."

According to Susan, Renee told appellant to get rid of the stolen property because she did not want it in her house; Davis left and returned about thirty minutes later explaining that he had dumped the property in the woods in a remote area. Four days after the murder a number of the items taken in the Haley burglary, as well as Mrs. Daniel's house and car keys, were found in a remote area of Benton County. Renee told her other roommate, Dwayne, about Davis's suspicious behavior and the stolen property. He urged her to go to the police.

Ultimately, the police arrived at Davis's home to question Renee, and she and the other two roommates agreed to let them search the house. Among the many items discovered in the house was a .44 magnum Redhawk revolver, which the State later alleged was the murder weapon that killed Jane Daniel. Also discovered was the Amish quilt taken from the Haley residence. Inquiries at pawn shops in the area revealed that Davis had pawned many items taken from both the Haley and Davis

residences.

By this time, Davis had fled the state by taking a bus to Las Vegas, Nevada and ultimately arriving in California. Witnesses from several pawn shops in Las Vegas testified that they had loaned the appellant money on goods he had pawned. These goods matched the description of goods stolen from the Davis and Haley households. Agents with the Federal Bureau of Investigation found the appellant in Albuquerque, New Mexico, and arrested him. While being arrested, Davis asked the agents for the cigarettes that had been in his car; he described them as Kool filter kings, the same brand of cigarette found at Mrs. Daniel's house. Investigators also found Davis in possession of the black leather jacket stolen from the Haley house. Detective Steven Mark Russell testified that he travelled to Albuquerque to transport Davis back to Rogers, Arkansas, and once they arrived in Rogers, Davis specifically asked for some Kool cigarettes.

Violette Hnilica, forensic pathologist with the Little Rock Medical Examiners Office, also testified at the trial. After conducting an autopsy she concluded that Jane Daniel had died from a contact wound resulting from an execution-style murder by a large caliber weapon to the back of her head.

Jeff Beck, a latent prints examiner with the State Crime Laboratory, testified he had tested fingerprints found on the masking tape holding the inner garage door open at the Haley residence and concluded that the prints belonged to Davis.

Berwin Monroe, Chief of the Firearms and Tool Marks section and an explosives analyst with the Arkansas State Crime Lab, also testified for the prosecution. He performed tests on the fragments of a metal jacket bullet removed from the victim and determined that this bullet was shot from the .44 magnum revolver discovered at Davis's place of residence. State Crime Laboratory Firearms Examiner, Ronald Andrejack, corroborated Monroe's findings.

## I. Sufficiency of the Evidence

For his first argument on appeal, Davis contends that the evidence was insufficient to support his capital murder conviction. We hold to the contrary.

■■ Based on *Burks* v. *United States*, 437 U.S. 1 (1978), where the United States Supreme Court held that the double jeopardy clause precludes a second trial when a conviction in a prior trial was reversed solely for lack of evidence, we have held that preservation of an appellant's right to freedom from double jeopardy requires a review of sufficiency of the evidence prior to a review of trial errors. *Luckach* v. *State*, 310 Ark. 119, 835 S.W.2d 852 (1992); *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984). The test for determining the sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Ricketts* v. *State*, 292 Ark. 256, 729 S.W.2d 400 (1987). On appeal, this court reviews the evidence in the light most favorable to the appellee and sustains the conviction if there is any substantial evidence to support it. *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Hodge* v. *State*, 303 Ark. 375, 797 S.W.2d 432 (1990); *Jones* v. *State*, 269 Ark. 119, 598 S.W.2d 748 (1980).

■■■ Davis complains that the evidence was insufficient because it was almost all circumstantial. However, circumstantial evidence can be enough to sustain a conviction:

> The law makes no distinction between circumstantial and direct evidence. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982). For circumstantial evidence to be sufficient, it must exclude every reasonable hypothesis consistent with innocence. It is up to the jury, however, to determine whether the evidence excludes every hypothesis. *Traylor* v. *State*, 304 Ark. 174, 801 S.W.2d 267 (1990). The matter of premeditation and deliberation and intent may all be inferred from the circumstances. An instant of premeditation is enough to sustain a conviction.

*Cigainero* v. *State*, 310 Ark. 504, 838 S.W.2d 361 (1992).

Our legislature has defined capital murder as:

> A person commits capital murder if: (1) Acting alone or with one (1) or more other persons, he commits or attempts to commit rape, kidnapping, arson, vehicular, piracy, BURGLARY, or escape in the first degree, and in the course

of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to human life.

Ark. Code Ann. § 5-10-101(a)(1) (1987)(emphasis added).

Here, the evidence is more than sufficient to prove that Davis murdered Jane Daniel while burglarizing her home. The gun, which ballistics experts determined shot the bullet that killed Mrs. Daniel, was found in Davis's place of residence. Two of his roommates testified that they had seen him with the gun and noticed that he was very agitated. Further, Davis's roommate, Renee, testified that on the day Davis returned home with property later identified as coming from the Daniel and Haley houses, he had admitted to her that someone had died during the course of a burglary. In fact when she tried to pick up the gun he was carrying in a towel, he threatened, "it would be her death sentence."

Property taken from both the Haley and Daniel homes was seen in Davis's possession by his roommates and various pawn-brokers, in and out of state. For example, Renee Davis testified that she had discovered a green and brown drawstring jewelry bag containing pearls. (This was later identified as the victim's bag and jewelry). A Kool cigarette butt was left at the crime scene and the appellant was known to smoke this specific brand of cigarettes. Equally telling was the fact that the gun used to kill Jane Daniel was identified as having been stolen from the Haley home and was left by appellant in his former residence.

Also incriminating is the fact that Davis fled the scene and went out of state after the murder. This court has held that an appellant's flight to avoid arrest can be considered as corroboration of evidence tending to establish his guilt. *Ferguson v. State*, 298 Ark. 600, 769 S.W.2d 418 (1989). In sum the evidence implicating Davis is overwhelming.

## II. Ballistics Expert

For his next argument, Davis submits that the trial court erred in refusing his formal motion asking for funds to employ Donald Nittskoff, a ballistics expert, to assist in the preparation of his defense. He contends that it was fundamentally unfair to be

denied this expert's assistance because the State had to prove that the bullet fragments and casing found at the murder scene were shot from a stolen gun in order to prove him guilty beyond a reasonable doubt. We disagree with Davis's assertions and that the trial court erred.

Prior to trial, Davis petitioned the trial court to furnish funds to provide for the employment of experts in the fields of ballistics, sociology, and psychiatry, as well as funds for an investigator to assist in the preparation of his defense. The trial court ordered the State to fund the employment of the investigator and denied the requests for the funding of the various experts.

Obviously it is impossible to establish a black-letter rule for determining whether an indigent defendant was denied a fundamental right to an effective defense because of the trial court's refusal to grant public funds to hire an expert. In psychiatric expert defense cases, we have held that in order for an expert to be appointed, the defendant must make a preliminary showing that his sanity at the time of the offense is to be a significant factor at trial. *See Day* v. *State*, 306 Ark. 520, 816 S.W.2d 852 (1991); *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991); *Pruett* v. *State*, 287 Ark. 124, 697 S.W.2d 872 (1985). This is understandable as the defendant has a presumption of sanity to overcome in cases where sanity is an issue.

However, in other situations involving experts, where there is no presumption to overcome, this court has not employed the significant factor requirement. Instead, we have provided examples of insufficient grounds for obtaining an expert but have not, thus far, specified what would constitute an adequate basis. *Cessor* v. *State*, 282 Ark. 330, 668 S.W.2d 525 (1984); *Pickens* v. *State*, 279 Ark. 457, 652 S.W.2d 626 (1983); and *Adams* v. *State*, 276 Ark. 18, 631 S.W.2d 828 (1982).

In *Cessor* we noted that the trial court did not err in denying appellant's motion for an additional ballistics expert when the defendant did not name the ballistics expert he wished to employ or support his contention by showing what, if anything, an additional ballistics expert could offer on his behalf. Our holding in *Cessor* suggested that, if a defendant furnished the trial court with these specifics, his request for an expert should be granted.

Here, Davis, in his motion for employment of the firearms expert, named his expert, asked the State to expend some $4,000 in funds for his expert's employment, and explained to the court that his expert would test and help analyze the bullet fragments and shell casings and would help analyze, interpret, and assist him in understanding the State's ballistic evidence for all purposes, including effective cross-examination of the State's two ballistic experts, Berwin Monroe and Ronald Andrejack of the State Crime Lab. Yet, Davis failed to make a showing of an ascertainable need in his motion or at the hearing on the motion. At the hearing, it was apparent to the trial court that counsel had not interviewed or had any discussions with the State's experts, as the following exchange between counsel and the court reveals:

> Court. All right. Well, the Court's position in regard to these two matters is that — and I gather, Mr. Morris and Mr. Martin, that you-all have not as of yet interviewed or had any discussion with the experts from the State Crime Lab in regard to either one of these issues.

> Defense. No, sir, that's correct, your Honor.

> Court. Well, at the state that this is in at this point in time to authorize that to the Court would simply — there simply seems to be a financing of a fishing expedition and I deny the motion.

Davis's counsel and his investigator subsequently interviewed Monroe and Andrejack, and Davis elected not to renew his motion or to show to the court the defense's specific need for utilization of a ballistics expert. In that light, we hold that there was no error in the trial court's decision to deny the request for a ballistics expert. Simply put, the request was premature. To hold otherwise would be to grant license to defense attorneys to obtain experts for their indigent clients without a showing of an ascertainable need.

### III. Sociologist Expert

As mentioned previously, prior to trial, Davis's counsel filed a motion asking the trial court to authorize funds so that he could employ a sociologist to conduct a study to determine whether death-qualified juries are constitutional, but, at a hearing on this motion, the court refused. On appeal, Davis claims that this

refusal was a violation of his Sixth and Fourteenth Amendment rights under the United States Constitution.

Clearly, as Davis points out, fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." *Ross* v. *Moffitt*, 417 U.S. 600, 612 (1974). However, Davis wanted the funds to pay for the sociologist to pursue a moot point.

This court has on numerous occasions rejected the notion that death-qualified juries are unconstitutional. *Hickson* v. *State*, 312 Ark. 171, 847 S.W.2d 691 (1993); *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986); *Rector* v. *State*, 280 Ark. 385, 659 S.W.2d 168 (1983), *cert. denied* 466 U.S. 988 (1984). The United States Supreme Court has also rejected this argument, holding that death-qualified juries are constitutional. *Lockhart* v. *McCree*, 476 U.S. 162 (1986).

Citing *McCree* for support, Davis has based his argument that the trial court erred on the premise that the United States Supreme Court in *McCree* reached its decision that death-qualified juries are constitutional because the sociological studies with which it was presented were deficient. The Court noted, in this regard:

> Having identified some of the more serious problems with McCree's studies, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more conviction prone than non-death qualified juries. We hold, nevertheless, that the constitution does not prohibit the states from death qualifying juries in capital cases.

*McCree*, 476 U.S. at 173.

It is evident that the United States Supreme Court was not basing its opinion on the presumption that the studies were deficient. The court enumerated the fifteen studies presented, pointed out the problems with each study, and then determined that *even if the studies had not been deficient*, death-qualified juries would still be deemed constitutional.

Thus, the conclusion cannot be made from Davis's

argument that his proposed sociological study would have un-earthed a new result. As a result, this argument is meritless.

## IV. Psychiatric Expert

Davis also claims that the trial court erred in not granting funds for a psychiatric expert arguing that, although State Hospital psychiatrists examined him, these examinations were deficient because doctor/patient communications were not privileged.

Davis received a psychiatric evaluation at state expense from the Ozark Guidance Center. The psychiatrist there concluded that there was a lack of psychosis but that David did have attention-deficit hyperactivity disorder residual, which could have contributed to the commission of the offenses.

Subsequently, Davis, joined by the State, filed a motion for psychiatric evaluation at the Arkansas State Hospital, which was granted. The resulting medical report revealed no psychoses but did indicate a psychoactive substance abuse and antisocial personality disorder.

Next, Davis asked the court for funds to employ an independent psychiatric examiner, which the court refused to do. Case law supports the trial court's decision. This court has held that it is not error for the trial court to refuse to grant an appellant's motion for a psychiatric examination by a private psychiatrist at state expense. *Love* v. *State*, 281 Ark. 379, 664 S.W.2d 457 (1984). Perhaps most persuasive is the recent case of *Sanders* v. *State*, 308 Ark. 178, 824 S.W.2d 353 (1992):

> With respect to the question of a defendant's sanity at the time an offense was committed and competency to stand trial, this court has held that the statutorily provided review by a state hospital is sufficient. *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991). As previously stated, the appellant was examined by such a facility and found to have no problems with his sanity. The appellant is in fact arguing that he should have been allowed the "opportunity to have a second opinion." Again, the Supreme Court did not hold in *Ake* that a defendant has the constitutional right to choose a psychiatrist of his personal liking or to shop around to find one who will support his insanity

defense.

*Sanders*, 308 Ark. at 183, 824 S.W.2d 353, 356.

In light of these cases, we conclude that the trial court did not err in refusing to approve funding of a private psychiatric evaluation for Davis after approving two previous evaluations.

### V. Allegation of Prosecutorial Misconduct

This final issue arises from comments that the prosecuting attorney made to the jury during his closing arguments in the penalty phase of the trial:

> I would suggest to you that the murder, the crime that the Defendant did in this case — his actions represent one of civilized society's worst nightmares, a situation in which in broad light of day, in the middle of the day, in a peaceful neighborhood here in Northwest Arkansas, with a housewife/grandmother coming home to fix her lunch, feeling totally safe in the sanctuary of home that she instead was faced with an armed and bold, calculating and ruthless criminal who saw her cross the street and decided this was a chance for some quick easy money and grabbed up his gun and drove over there and went in specifically looking for her. This wasn't one of those deals where they were trying to burglarize a house and accidentally stumbled upon somebody that's in there, or even that they came home, which is another reason to consider the seriousness of the burglary of Mike and Sharon [Haley]. What if Sharon had come home? What then?

The trial judge's control of such remarks during closing arguments is discretionary and will not be reversed in the absence of an abuse of discretion. For example, in *Wilson v. State*, 295 Ark. 682, 751 S.W.2d 734 (1988), the prosecutor asked the jurors to impose the death penalty and to "tell Ron Wilson he will never commit another murder." *Wilson*, 295 Ark. at 690, 751 S.W.2d at 739. The trial court refused to do anything about the remark, and this court agreed with its decision explaining that "The court's ruling. . .about the remark was discretionary, and in the absence of an abuse of discretion, will not be reversed." *Id.* We found no abuse of discretion, having determined that the request was made in the context of urging the

jurors to "act as a group in imposing the sentence. In context, it did not suggest that there was evidence from which it could be determined that Wilson would kill again." *Wilson*, 295 Ark. at 690, 751 S.W. 2d at 739. This analysis applies to the facts at hand, for the prosecutor's remarks about Davis are similar to the prosecutor's statements in *Wilson.*

Other jurisdictions have held that, in the penalty phase of a capital murder case, both parties should be given wide latitude in arguing the matter of punishment. *State* v. *Feltrop*, 803 S.W.2d 1 (Mo.banc 1991); *State* v. *McDonald*, 661 S.W.2d 497 (Mo.banc 1983). Although this court has never specifically adopted this rule, we have held that counsel should be allowed some leeway with respect to opening and closing remarks. *Abraham* v. *State*, 274 Ark. 506, 625 S.W.2d 518 (1981). The trial court has wide latitude of discretion in controlling the arguments of counsel, and its ruling in that regard will not be overturned in the absence of abuse. *Cobbs* v. *State*, 292 Ark. 188, 728 S.W.2d 957; *Shaw* v. *State*, 271 Ark. 926, 611 S.W.2d 522 (1981). We have also held that improper statements by a prosecutor in his opening argument are cured by an instruction to the jury that remarks of counsel are not evidence and, unless supported by evidence, should be disregarded. *Miller* v. *State*, 309 Ark. 117, 827 S.W.2d 149 (1992). Under the circumstances, we hold that the trial court did not abuse its discretion.

Lastly, we undertake a proportionality review of all death penalty cases to insure that the sentence is not imposed in a freakish, capricious, or whimsical manner. *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993); *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992), *cert. denied*, 112 S.Ct. 3043 (1992). Here, the victim, while in her home in the middle of the day, was shot execution-style in the back of the head with a large-caliber weapon. Numerous items were taken from her home. The robbery-murder in this case is similar to the robbery-murders in *Johnson* v. *State*, 308 Ark. 1, 823 S.W.2d 800 (1992); *Whitmore* v. *State*, 296 Ark. 308, 756 S.W.2d 890 (1988); and *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986) that were punished with the death penalty. The death penalty in this case was not freakishly or arbitrarily applied.

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record has been

examined, and this review has uncovered no prejudicial errors warranting reversal.

Affirmed.

GLAZE, J., concurs.

TOM GLAZE, Justice, concurring. I concur to update the history of our review of capital cases contained in *Robertson* v. *State*, 298 Ark. 131, 765 S.W.2d 936 (1989) (Hickman and Glaze, JJ., concurring), *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986) (Hickman, J., concurring), and *Ruiz and Denton* v. *State*, 280 Ark. 190, 655 S.W.2d 441 (1983) (Hickman, J., concurring).

Since *Robertson*, we have upheld the imposition of the death sentence in the following cases: *Ruiz and Denton* v. *State*, 299 Ark. 144, 772 S.W.2d 297 (1989) (affirmance of imposition of death sentence after resentencing proceeding). (After escaping from an Oklahoma prison, Ruiz and Denton kidnapped, robbed and shot to death the Magazine, Arkansas, town marshall and a Corps of Engineers employee.); *Parker* v. *State*, 300 Ark. 360, 779 S.W.2d 156 (1989), *cert. denied*, 498 U.S. 883 (1990) (affirmance on retrial after case reversed and remanded by this court on capital murder conviction in *Parker* v. *State*, 292 Ark. 421, 731 S.W.2d 756 (1987); petition for post-conviction relief denied, *Parker* v. *State*, CR88-95 (February 18, 1991). (Parker shot to death his former wife's parents.); *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990), *cert. denied*, 497 U.S. 1011 (1990) (affirmance of imposition of death penalty after second resentencing proceeding); petition for post-conviction relief denied, *Pickens* v. *State*, CR 89-94 (December 17, 1990), *cert. denied*, 497 U.S. 1011 (1991) (Pickens shot and killed a customer in a convenience store robbery); *Wainwright* v. *State*, 302 Ark. 371, 790 S.W.2d 420 (1990), *cert. denied*, 499 U.S. 913 (1991); petition for post-conviction relief denied, *Wainwright* v. *State*, CR 89-79 (January 13, 1992). (Wainwright shot to death a convenience store clerk in an robbery.); *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991), *cert. denied*, ____ U.S. ____, 112 S.Ct. 102 (1991). (Coulter raped and murdered a five year old child.); *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992). (Johnson bludgeoned to death a night watchman); and *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993). (Henderson

murdered the owner of a furniture store during a robbery.)

Petitions for post-conviction relief were also denied in *Whitmore* v. *State*, 299 Ark. 55, 771 S.W.2d 266 (1989). (Whitmore robbed and stabbed to death an elderly woman at her home.); and *Starr* v. *State*, CR 87-20 (November 12, 1989), *cert. denied*, 489 U.S. 1100, 110 S.Ct. 1327 (1990). (Starr sexually assaulted and bludgeoned to death a woman at her home.)

We granted post-conviction relief in part in *O'Rourke* v. *State*, 298 Ark. 144, 765 S.W.2d 916 (1989). We stayed the appeal of an order in *O'Rourke* and remanded for consideration by the trial court of whether O'Rourke was competent to abandon his post-conviction appeal. *O'Rourke* v. *State*, 300 Ark. 323, 778 S.W.2d 938 (1989). We subsequently granted the State's motion to dismiss the post-conviction appeal. *O'Rourke* v. *State*, CR 89-145 (January 14, 1991). This court then denied a motion filed by O'Rourke to reinstate the appeal of the order denying post-conviction relief. *O'Rourke* v. *State*, CR 89-145 (February 24, 1992). (O'Rourke murdered his mother and father.)

The judgment and death sentence were reversed and re-manded in *Clements* v. *State*, 303 Ark. 319, 796 S.W.2d 839 (1990). On retrial, the defendant was convicted of second degree murder and sentenced to twenty years imprisonment.

We affirmed the judgment of conviction but reversed the death sentence and remanded the case for resentencing in *Sanders* v. *State*, 308 Ark. 178, 824 S.W.2d 353 (1992). The death penalty was again imposed and is on appeal to this court. (Sanders robbed and shot to death a Hot Spring County couple.)

We reversed and remanded the case for retrial in *Duncan* v. *State*, 309 Ark. 218, 831 S.W.2d 115 (1992), and in *Mauppin* v. *State*, 309 Ark. 235, 831 S.W. 104 (1992). On retrial, Mauppin was again convicted of capital murder but sentenced to life imprisonment without parole.

In *Ward* v. *State*, 308 Ark. 415, 827 S.W.2d 110 (1992), we affirmed in part and reversed in part and remanded the case for resentencing. Ward was again sentenced to death and the sentence is on appeal to this court. (Ward murdered a convenience store clerk.)

We reversed and remanded *Brenk* v. *State*, 311 Ark. 579, 847 S.W.2d 1 (1993).

We also reversed and remanded the case of *Johnnie Michael Cox* v. *State* to the trial court for appointment of counsel and post-conviction proceedings. *Cox* v. *State*, 305 Ark. 488, 807 S.W.2d 665 (1991). The judgment and death sentence in *Cox* were ultimately affirmed by this court. *Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993). (Cox's three victims died from a combination of injuries received when he stabbed and strangled them and then set afire the apartment they were in.)

We affirmed the judgment and sentence in *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993). (Sheridan stabbed to death a pregnant woman.)

The death sentence has been executed in four cases since *Robertson*: *Ronald Gene Simmons* v. *State*, *John Edward Swindler* v. *State*, *Rickey Ray Rector* v. *State*, and *Steven Douglas Hill* v. *State*. (Simmons shot and killed several persons in a shooting spree. This court upheld his right to waive a direct appeal of his conviction and death sentence. *Franz* v. *State*, 296 Ark. 181, 754 S.W.2d 839 (1988); Swindler killed a Ft. Smith police officer; Rector killed a Conway police officer; and Hill, who had escaped from the Arkansas Department of Correction, shot and killed an Arkansas State trooper who was attempting to arrest him.)

It was noted in the concurring opinion to *Robertson* in 1989 that several cases appeared to have disappeared into the federal judicial machinery. Now, four years after *Robertson*, it is notable that two of the cases mentioned remain in the exact same posture. The cases of Eddie Lee Miller, affirmed by this court in 1981, and Clay Anthony Ford, affirmed in 1982, remain in the United States District Court on pending petitions for writs of habeas corpus. The habeas corpus petitions in the two cases have languished in the district court for nearly twelve years in the *Miller* case and more than ten years in the *Ford* case. In the case of Darrell Wayne Hill, affirmed by this court in 1982, the district court granted the petition for writ of habeas corpus after it languished for approximately ten years. The matter is now on appeal by the state to the Eighth Circuit Court of Appeals. (Miller murdered a storekeeper in a robbery; Ford, an escapee

from the Tennessee Department of Correction, shot and killed an Arkansas State Police trooper; Hill kidnapped, robbed, and shot two men in a robbery of a service station, one of the men died.)