Billy Don TANNER *v.* STATE of Arkansas

CR 75-107 · 532 S.W. 2d 169

Opinion delivered February 9, 1976

244

*Kenneth C. Coffelt*, for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Gary Isbell,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Billy Don Tanner was charged with the capital felony murder of his sister-in-law, Sue Keith and her two children Carolyn Sue, aged three, and James Randall, aged six, by beating them "and cutting their throats with a knife". He was found guilty by a jury and sentenced to life imprisonment without parole. He contends on appeal that the statute providing for imprisonment without parole is unconstitutional and that the trial court erred in admitting into evidence a confession and certain photographs.

Appellant argues that the statute [Ark. Stat. Ann. § 41-4707 (Supp. 1973)] is unconstitutional because life imprisonment without parole is in violation of Art. 6 § 18 of the Constitution of Arkansas, which vests the power to grant pardons, reprieves and commutations of sentences in the Governor. This power is specifically recognized in the questioned statute, which specifically provides that one sentenced to life imprisonment without parole may not be released except pursuant to a commutation, pardon or reprieve by the Governor under procedures provided in Ark. Stat. Ann. § 41-4714 (Supp. 1973). Appellant does not question the section relating to the procedures required for the grant of clemency, but says only that the statute is invalid because of the inclusion of the words "without parole".

Although parole may have some characteristics similar to a pardon or reprieve, we do not take it to be a matter of gubernatorial clemency under our constitution as distinguished from administrative conditional release from imprisonment which may be controlled or prohibited by legislation that is not discriminatory. Parole has been defined as a supervised release from incarceration prior to the termination of a sentence. *Roach* v. *Board of Pardons & Paroles,* 503 F. 2d 1367 (8th Cir., 1974). We have, at least tacitly, accepted this definition by saying that one who is released on parole is subject to control and supervision by state authorities and may be returned to prison for violation of rules or conditions under which his parole is granted. *Gulley* v. *Apple,* 213 Ark. 350, 210

S.W. 2d 514. In our view, this definition of parole more closely parallels the judicial suspension of a sentence that has been pronounced than the exclusive subjects of gubernatorial clemency - pardon, reprieve and commutation. We have specifically held that the statute allowing postponement or suspension of sentence did not violate Art. 6 § 18. *Emerson v. Boyles,* 170 Ark. 621, 280 S.W. 1005; *Murphy v. State,* 171 Ark. 620, 286 S.W. 871, 48 ALR 1189. By like reasoning, Ark. Stat. Ann. § 41-4707 does not either.

Appellant next contends that his confession was involuntary as a matter of law and fact under the undisputed evidence and, therefore, inadmissible. We do not agree. In order for us to reverse the holding of the circuit judge that the state had met its burden of proving that the in-custody confession was voluntary, we must find from an independent determination, based upon the totality of the circumstances, that it was clearly against the preponderance of the evidence. *Degler v. State,* 257 Ark. 388, 517 S.W. 2d 515.

In support of his contention, Tanner asserts that his confession was obtained by trickery, that he did not have the assistance of counsel, and that he had been deprived of food and sleep for a long period of time. Tanner did not testify at the Denno hearing and did not produce any witnesses there. The testimony of the officers is, as Tanner concedes, undisputed. We find that it was clearly sufficient to overcome the presumption against voluntariness, if accorded full weight, as it was.

Sheriff Marlin Hawkins was informed of the murders about 1:00 a.m. on August 16. He caused an investigation to be commenced. He went to Tanner's residence, along with Lt. Howard Chandler, an Arkansas State Police criminal investigator, Dr. Rodney Carlton, the State Medical Examiner, and Deputy Sheriff Earl Smith at 5:00 to 5:30 p.m. and found Tanner out in his yard. Tanner came to the automobile and sat in it beside Hawkins. Hawkins testified that Lt. Chandler advised Tanner of his constitutional rights and that Tanner said he didn't want an attorney because he hadn't done anything. Hawkins told Tanner that they were investigating the murder of Mrs. Keith and her two children and told

Tanner that there was a rumor that there had been blood on his clothes. The sheriff then asked Tanner where he got the blood. Tanner explained that, while driving his truck hauling logs from Dover to Menifee about 2:00 p.m. on August 15, he had rendered assistance to two boys who had an accident in a vehicle bearing a Kentucky license. According to Tanner, the boys had blood in their hair and this was the source of the blood on his clothes. Tanner told Hawkins that his bloody clothes were in a tub on the back porch of the Tanner house. When Hawkins asked Tanner when he quit work, Tanner replied that it was about 7:30 p.m. and that he had bought a 6-pack of beer and had gone to Little Rock, but he did not know where he went and what he did there. Hawkins then asked Tanner when he had learned there had been a murder and Tanner said that when he returned to his home about 11:00 p.m., his wife told him of it. Hawkins remarked that this was strange because no one knew there had been a murder until Mr. Keith arrived at his home about 12:45 a.m. on August 16. Hawkins then went to check on Tanner's story, and left further interrogation to Chandler.

Lt. Chandler corroborated Hawkins' testimony about his advice to Tanner of Miranda rights. He said that Tanner said that he would tell the officers what they wanted to know. According to Chandler, after Hawkins and Smith left, Tanner told Chandler of his activities on the day in question. This narration was virtually identical to that related to Hawkins, except that Tanner told Chandler he was notified of the death about 1:30 a.m., and said that he quit work at 5:30 or 6:00 p.m.

Tanner was taken into custody as a prime suspect and Deputy Sheriff Farrell Bradshaw brought him to the courthouse in Morrilton at approximately 7:30 p.m. Robert Jackson, a deputy sheriff, talked to Tanner there about 7:40 p.m. He said that he then advised Tanner of his constitutional rights and that Tanner signed a waiver of Miranda rights at 7:48 p.m. Jackson advised Tanner of the nature of the investigation and told Tanner that he was the subject of that investigation. Tanner again made his statement about the accident, but Jackson told him that, although there had

been such an accident, there had been no injuries.[1] According to Jackson, Tanner then said that he was not responsible for the murders and would take a "lie detector test" to prove his innocence. Jackson said that when Tanner insisted upon such a test, he contacted Sgt. Don Walls, polygraph examiner for the Arkansas State Police, and arranged for one. Jackson, Tanner and Deputy Sheriff John Hawkins, who had also participated in the questioning of Tanner at the courthouse, arrived at State Police Headquarters about 9:15 p.m. Capt. McDonald of the Arkansas State Police was called and trace metal tests were conducted by him when he arrived at headquarters 30 minutes later. This test to determine whether Tanner had handled a weapon such as a knife found at the murder scene was inconclusive. Capt. McDonald, during this time, advised Tanner of his rights, but Jackson could not recall specifically what McDonald had said. At some time after arrival at State Police Headquarters, Tanner reiterated his account of the source of the blood on his clothing. The Conway County officers and Tanner remained with Capt. McDonald until 11:30 p.m. Sgt. Walls then took charge of Tanner and went into Walls' office in an adjoining room to prepare Tanner for the polygraph examination. Sgt. Walls emerged about 12:35 a.m. and advised Jackson and Hawkins that Tanner wanted to make a statement.

Walls testified that he prepared Tannner for the examination by interviewing him for approximately one hour to get acquainted with him, obtain background information and advise him of the type of questions that would be asked. According to Walls, full development of the subject's background is time consuming, but essential to proper framing of questions in conducting a polygraph examination. He said that no one else was in the room while this was being done. Walls stated that the examination was never conducted, because Tanner said that he had a statement he wanted to make. Walls then called Hawkins and Jackson and in their presence advised Tanner of his rights. Jackson testified that Tanner then said he had something he wanted to get off his chest.

---

[1]Jackson did not investigate. This information came to him from other officers.

Tanner then made an oral statement of which handwritten notes were made by Walls and signed by Tanner. The notes were commenced at approximately 12:45 a.m. and completed in approximately one hour. Tanner then wrote out his statement in his own handwriting. He started at about 1:40 a.m. and took about an hour. Walls testified that his notes and Tanner's written confession were substantially identical.

Jackson had had no supper that evening and felt sure that Tanner had had none. The Conway County officers left the State Police Headquarters about 3:20 a.m. and arrived at Morrilton about 4:20 a.m. Walls had advised Tanner that he was under arrest on the murder charges at about 3:10. This officer had at that time been advised of the issuance of warrants in Conway County. Tanner was placed in a cell in the Conway County jail with 12 or 14 other prisoners, three of whom had been charged with murder. When arraigned about 10:00 a.m. that morning in the circuit court, Tanner had suffered a beating and was taken to a hospital for treatment. There was no evidence to indicate that any officer struck Tanner or used any physical force on him, and there is no contention by appellant that there was. Appellant emphasizes the fact that at the moment before he signed his confession he was not told of his right to counsel. The evidence would indicate that he had been told of this right four or five times in the preceding hours, once just before he gave the statement.

We certainly cannot say that the circuit judge's finding that the presumption of involuntariness had been overcome was clearly against the preponderance of the evidence. Furthermore, there was no evidence that required that the state call Deputy Sheriff Hawkins to testify in order to meet its burden of proof. See *Gammel and Spann* v. *State,* 259 Ark. 96, 531 S.W. 2d 474 (1976). The reason for requiring the testimony of all material witnesses who were connected with a controverted confession is that otherwise testimony charging violence, threats, coercion, or offers of reward, leniency and assistance stands uncontroverted. See *Russey* v. *State,* 257 Ark. 570, 519 S.W. 2d 751; *Smith* v. *State,* 254 Ark. 538, 494 S.W. 2d 489. Here there was no testimony for Hawkins to

controvert. There was no reversible error in connection with the admission of the confession.

Appellant next challenges the admission of certain photographs showing the bodies of the victims of a very brutal assault because, he says, their only purpose was to inflame the minds of the jury. His argument is that the witnesses could and did adequately describe the scene, the position of the bodies, the lay of the surroundings and every other essential fact and circumstance, including the manner of the killing and the area where the victims were stabbed and struck. He also argues that there was no need for corroboration of the witnesses who testified, relying upon *Smith* v. *State*, 216 Ark. 1, 223 S.W. 1011. There we quoted respectable authority that admissibility of photographs depends not on whether the objects portrayed could be described in words, but rather on whether they would be useful to enable the witness to better describe and the jury to better understand the testimony. But we there recognized that the question of admissibility and relevancy of photographs must lie largely within the discretion of the trial judge. We also recognized that the description of the character of wounds inflicted upon the victim is always admissible in evidence, that there was no rule limiting the description to word of mouth and the fact that a photograph was cumulative to oral testimony did not affect its materiality. We took an apt quotation from *Nicholas* v. *State*, 182 Ark. 309, 31 S.W. 2d 527, which included this statement: "We do not think the most accurate method of reflecting a truth should be eliminated, but, just to the contrary, such a method should be approved and accepted." The mere fact that a photograph which depicts the wounds and injuries inflicted upon a body are gruesome is not sufficient to justify excluding it. Indeed the very thing that makes the photograph appear gruesome is often relevant and very material on such issues as malice, premeditation and deliberation. *Witham* v. *State*, 258 Ark. 348, 524 S.W. 2d 244 (1975).

It was shown that the photographs taken within two hours of the discovery of the bodies of the dead woman and her children accurately depicted the scene found by officers when they went to the Keith mobile home where the victims

had been slaughtered. One of the objects shown was a broken knife which was undoubtedly one of the murder weapons. The assistant state medical examiner who arrived at the scene within two hours after the photographs were taken, pointed out in testimony in chambers that each of the photographs illustrated that the victims, whose bodies showed evidence that they had been both beaten and stabbed, were alive when stabbed and that the photographs would be helpful to the jury in following and understanding his testimony. There were both black and white and color photographs. This pathologist said that the color pictures showed detail that he could not see in the black and white prints. He did point out in the presence of the jury the features in at least some of the photographs which depicted conditions which lead him to the conclusion that the victims were alive when stabbed and that the stabbing was the cause of death. Admittedly neither this witness nor the chief medical examiner who performed an autopsy on Mrs. Keith used any of the photographs in arriving at their conclusions, but both used the photographs to illustrate things that they had observed about the bodies in arriving at their conclusions. This testimony demonstrates admissibility of the photographs because they shed light on material issues and enabled witnesses to better describe that which was depicted and the jury to understand the testimony. *Perry v. State,* 255 Ark. 378, 500 S.W. 2d 387.

It is also noteworthy that the photographs tended to corroborate the appellant's confession, the voluntariness of which was submitted to the jury. See *Shipman v. State,* 252 Ark. 285, 478 S.W. 2d 421.

Clearly there was no abuse of discretion in the admission of these photographs.

Other objections made by appellant in the trial court, but not argued here, have been carefully examined and found to be without merit. Objections to questions pertaining to the death penalty on voir dire of prospective jurors and excusal of some because of their convictions about the death penalty have been mooted by the jury verdict, as have objections to the bifurcated trial procedure and instructions as to

aggravating and mitigating circumstances in the punishment phase of the trial. There was no abuse of discretion in the disallowance of a challenge for cause to a juror employed as a nurse at the Conway County Hospital.

We have also considered an objection made by appellant to procedures relating to the making of peremptory challenges. Although the defendant exercised peremptory challenges, the state did not until eleven jurors were in the box. The judge then asked whether the state accepted these eleven and the prosecuting attorney challenged two of them. After appellant's objection was overruled, the court advised that appellant would be accorded the same privilege as soon as eleven had been tentatively accepted and appellant's counsel responded, "We will see what happens." Thereafter the state excused another prospective juror when there were eleven in the box and the objection was renewed. The next time the State excused one juror when there were eleven tentatively accepted, no objection was made by appellant. After the prosecuting attorney had again excused a prospective juror when there were eleven, the court inquired, "Does the defendant still remain silent?" Appellant's attorney responded, "I guess so." Still later, on two occasions when there were eleven in the box, the state challenged none, but appellant challenged one of the jurors.

The names of the jurors had been called individually and they had been examined individually on voir dire by both attorneys. There was no delay until exhaustion, or near exhaustion of challenges. The procedure followed was not identical to that in *Clark* v. *State,* 258 Ark. 490, 527 S.W. 2d 619 (1975). Under these circumstances, we must agree with the Attorney General that appellant acquiesced in the procedure. Furthermore, we did not say in *Clark* that the court had no discretion to allow a challenge after a tentative acceptance of a prospective juror but before the jury selection had been completed, at least where the adverse party has not exhausted his peremptory challenges. See *Ruloff* v. *State,* 142 Ark. 477, 219 S.W. 781.

Appellant objected to the testimony of Sgt. Walls relating to the preparation of an individual for a polygraph

examination. There was no error here. In the first place, the examination was being had at appellant's request. But more importantly it was necessary on the question of voluntariness of statements made by Tanner (which was submitted to the jury as to weight and credibility) that there be an explanation of what took place during the period of time appellant was alone with this officer.

It would unduly extend this opinion to recite numerous other objections made by appellant. In their consideration, we have been materially aided by a review of most of them by the Attorney General. It is sufficient to say that we have considered these and others the Attorney General listed as frivolous and find no prejudicial error.

The judgment is affirmed.