Christopher Ray STONE *v.* STATE of Arkansas

CR 94-61                                    900 S.W.2d 515

Supreme Court of Arkansas
Opinion delivered June 12, 1995

*Ray Hartenstein*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant, Christopher Ray Stone, appeals the judgment of his conviction by jury verdict in the Faulkner County Circuit Court of one count of murder in the first degree and sentence of life imprisonment. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). For reversal, appellant asserts four points of error. We find no merit and affirm.

## FACTS

The victim, David Webb, was found dead on November 16, 1991 at approximately 3:15 a.m. behind the check-out counter of a gas and convenience store in Greenbrier, referred to in the abstract as "Satterfield's," where he was employed as a clerk. Webb had been repeatedly stabbed and his throat had been cut. Cash in the approximate amount of $400.00 was missing. The customer who entered the store to pay for his gasoline purchase and discovered the victim's body told police that, as he was pumping the gasoline, he had observed a man run from the store and hurriedly drive away. Based on that customer's description, a computer-generated drawing of the suspect was produced. A second customer came forward later that morning and told police that, shortly before 3:00 a.m., she had seen Webb and another man standing behind the counter. This witness provided a description of the man she had seen with Webb and a second computer drawing of the suspect was produced.

When the computer drawings were displayed at the crime scene, other store employees remarked upon their resemblance to appellant, a Satterfield's employee. Further, appellant's car, a black late-model Chevrolet Beretta, fit the general description given of the vehicle which had been observed speeding away from the crime scene.

Faulkner County Sheriff Bob Blankenship and Arkansas State Police Investigator Jim Rainbolt shortly thereafter departed the crime scene to drive to appellant's residence near Greenbrier for the purpose of questioning him about the homicide. En route, they saw a black Beretta travelling at a high rate of speed in the opposite direction and unsuccessfully attempted to catch up with it. By radio dispatch at 11:40 a.m., Blankenship notified local law enforcement officers to stop the speeding vehicle.

At the scene where the Beretta was stopped on U.S. Highway 65, appellant was briefly questioned by Blankenship and there confessed to the murder. Appellant was arrested by Blankenship at 11:43 a.m. and transported to the Greenbrier Police Station where he first received notification from the police of his constitutional right against self-incrimination as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant then executed a written waiver of that right and consented to the videotaping of a

twenty-five minute interview with Rainbolt which commenced at 12:00 noon, wherein he again confessed to the murder.

Appellant was charged with capital murder by felony information filed on November 21, 1991. His first jury trial ended in a mistrial. His second jury trial was conducted in June 1993 and resulted in his conviction for murder in the first degree. The judgment and commitment order was filed on June 21, 1993. This appeal arises therefrom.

## I. ADMISSION OF CONFESSIONS

For his first assignment of error, appellant argues the trial court erred in denying his motion to suppress his confessions at the roadside and at the station-house. On November 25, 1992, appellant filed a pretrial motion to suppress all statements taken from him on November 16, 1991. An evidentiary hearing was conducted on January 25, 1993; the motion was renewed during both trials.

The testimonies of Blankenship and Rainbolt at the hearing on the motion to suppress show that, as they drove to appellant's residence near Greenbrier for the purpose of questioning him about the homicide, they saw a vehicle travelling at a high rate of speed in the opposite direction. Blankenship testified that, by radio dispatch, he notified local municipal law enforcement officers to stop the speeding vehicle.

Greenbrier City Police Officer Gary Cossey testified that at approximately 11:40 a.m. he received the radio dispatch and stopped the speeding vehicle, which was appellant's Beretta, on U.S. Highway 65 in Greenbrier. Cossey testified he first noticed the Beretta because it was travelling approximately twenty miles per hour in excess of the speed limit. Cossey testified he and appellant remained in their respective vehicles until Blankenship and Rainbolt arrived "momentarily." At about the same time, Cossey testified, several other law enforcement vehicles also stopped at the roadside scene[1]. Cossey testified that he "just stayed back away" and could not overhear any conversation between appellant and Blankenship.

---

[1]Our review of the transcript reveals that Cossey's later trial testimony was that, although he ticketed appellant for speeding, he did not arrest him.

Blankenship and Rainbolt each testified that they stepped out of their vehicle and approached the Beretta as appellant exited his vehicle and identified himself to the officers. Blankenship testified he first asked appellant why he was driving so fast, and appellant replied he was on his way to "the station" after receiving a telephone call informing him of Webb's death. Blankenship testified he then asked what appellant did the night before, and appellant replied he was riding with some friends, had gotten home around 2:00 a.m. and had stopped at Satterfield's for a free soft drink. Blankenship testified he then asked appellant what side of the building he was on, thinking appellant might have seen something, and appellant replied he had parked where all the employees parked on the store's south side. Blankenship testified he then asked appellant if he could look at appellant's house, and appellant replied that would be fine. Blankenship then testified:

> A.   I asked him if he would mind if we looked in the trunk, and at that point he said, I believe, I don't remember if he opened it then, he said, "Are you Sheriff Blankenship?" And, I said, "Yes." And that's when he — he threw his keys down and he said, "Well, you might as well go ahead and arrest me." And, I said, "What?" And, he said, "Well, you might as well go ahead and arrest me. I did it." And, I turned to Rainbolt and he said — and I said, "Did you hear that?" And, Rainbolt didn't hear it. And he said, "What?" And, uh —
>
> Q.   So, Rainbolt asked him again?
>
> A.   Said — said — he said, "What did you say?" And, he said, you know, "I did it. I stabbed David. I'm the one you're looking for. You would have caught me anyway."

Blankenship testified to his "shock" at the confession.

A narrative report dated November 16, 1991 and abstracted as "Traffic Stop Report of Sheriff Blankenship" was introduced at the hearing as Defendant's Exhibit 6. The only notable difference between the facts relating to the roadside confession as rendered in the report versus Blankenship's testimony is that the report makes no reference to any request by Blankenship to exam-

ine the Beretta's trunk[2], but states that, after appellant consented to a search of his house:

> Investigator Rainbolt told him to go ahead and drive his car up to his house. Mr. Stone walked over to the drivers side and started to get into his vehicle, as I walked to get into mine. He then turned around and asked me, "Are you Sheriff Blankenship?" I said "yes." He then walked to the back of the car towards me and threw his keys down and stated, "You might as well go ahead and arrest me."

The rest of the report is consistent with Blankenship's testimony describing the roadside confession, including the repetition of the confession for Rainbolt.

Rainbolt testified at the hearing that he recalled Blankenship questioning appellant about why he was driving so fast and what he had done the night before, but could not otherwise recall the "conversation of what all was asked, or anything else. It's — it's a general information-gathering type of question." Rainbolt was not questioned specifically about the moment of the confession.

Both officers testified that appellant was questioned as a witness and was not viewed as a suspect prior to his roadside confession. At the hearing, the trial judge, ruling from the bench, denied appellant's motion to suppress the roadside confession and stated:

> It appeared to me from the testimony and from what's been admitted as Defendant's Exhibit Number 6 that the statement made by Mr. Stone, that he's the one, you might as well go ahead and arrest me, was not a response to any question that was asked. It was merely a spontaneous confession.

During an *in camera* hearing conducted on June 17, 1993 immediately following jury selection in the second trial, appellant renewed his motion to suppress the confessions and, in support of the renewed motion, submitted a transcript of the testimony of appellee's witnesses given on February 11 and 12, 1993

---

[2]Likewise, Blankenship's trial testimony, as abstracted, makes no reference to any request to examine the Beretta's trunk.

in the first trial as "Defendant's Exhibit 1." The trial court summarily affirmed its initial ruling denying the motion.

At the first trial, Rainbolt testified that when appellant made his confession, appellant, Rainbolt and Blankenship were preparing to drive to appellant's house to look at the clothes he had worn the night before. Rainbolt testified:

> A. [A]s we were fixing to go out there, we told him, "Go ahead, get in your car. We'll follow you out there." Before he got in his car, he turned to the Sheriff and said, "I'm the one you're looking for. I stabbed David."

> Q. Okay. And this was after y'all had basically turned him lose [sic] to get in his car?

> A. Right. He was free to get in his car and — and take us out to his house.

> Q. Okay. And had you and the Sheriff both turned away from him?

> A. I had turned away from him. He called, — talked to the Sheriff, asked him if he was, I believe, Blankenship.

> Q. Okay. He called back at the Sheriff?

> A. Right.

> Q. Y'all both were heading back to your car when he called him?

> A. More or less, yes, sir.

> Q. All right. And the conversation had terminated at that point when he said — when he turned around and said, "Are you the Sheriff?"

> A. At that time, we transported him to the Greenbrier Police Department, Mirandized him, and took a statement from him.

At the second trial, Rainbolt's testimony was consistent with his testimony at the earlier trial. Additionally, he testified that appellant was "very cooperative."

■    A spontaneous statement, whether or not made by a

declarant entitled to the *Miranda* warnings, is not rendered inadmissible because those warnings were not given.[3] *Scherrer* v. *State*, 294 Ark. 287, 742 S.W.2d 884 (1988); *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985). This rule of law obtains because spontaneous statements are not compelled or coerced in any way significant under the Fifth Amendment's privilege against self-incrimination. The *Miranda* Court itself recognized this rule of law when it stated: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478. Consequently, in considering the issue of whether appellant's roadside confession was spontaneously made, we are not required to discuss whether appellant was then subject to custodial interrogation.

Appellant cites three cases in support of his argument that the roadside confession was not spontaneous: *Scherrer*, 294 Ark. 287, 742 S.W.2d 884; *Shelton*, 287 Ark. 322, 699 S.W.2d 728; and *Beed* v. *State*, 271 Ark. 526, 609 S.W.2d 898 (1980). In *Scherrer* and *Shelton*, the decisive factor on the issue of whether the appellant's incriminating statement to the police was spontaneous was whether it was the result of police questioning. In *Beed*, we found reversible error on grounds not pertinent to this appeal. In that opinion, we addressed, as an issue likely to arise on retrial, appellant's objection on Fifth Amendment grounds to the admission of an incriminating statement he made in jail during a telephone conversation which was overheard. We observed the overheard statement was not the result of any interrogation

---

[3]The *Miranda* warnings were intended to inhibit the abuse of the Fifth Amendment right against self-incrimination of a person by reason of "custodial interrogation" by law enforcement officers. *See generally* David M. Nissman and Ed Hagen, *Law of Confessions*, chs. 4-5 (2d ed. 1994). "Interrogation" means the express questioning or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). "In custody" means a person who is deprived of his freedom of action by formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury* v. *California*, ___ U.S. ___, 114 S. Ct. 1526 (1994); *State* v. *Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995). The *Miranda* Court held that a person subjected to custodial interrogation by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. Statements elicited in violation of this rule may not be admitted for certain purposes in a criminal trial. *Stansbury*, ___ U.S. ___, 114 S. Ct. 1526.

whatsoever and that it might be advisable for the court on retrial to conduct a hearing to determine the voluntariness of the statement.

In *Scherrer*, we held a jailed defendant's incriminating statement to Officer Moore was spontaneous where there was no indication that Moore questioned the defendant or intended to elicit the defendant's incriminating statement when he spoke with him after Moore was asked by the defendant to come to his cell and the defendant brought up the subject with respect to which his incriminating statement was made.

In *Shelton*, we held a defendant's incriminating statement to Officer Liles was not spontaneous as it was the result of questioning where, sometime after the defendant was awakened by the police P.A. system at 2:30 a.m., the defendant and Liles were left alone in the police vehicle, Liles told defendant of the seriousness of the crime (murder) and stated that if defendant knew anything about it or could help locate the suspects, "he'd better go ahead and do it," whereupon tears came to the defendant's eyes and he stated "'We did it'" and "'We were there.'" *Id.* at 327, 699 S.W.2d at 730.

■■ In determining whether appellant's confession was admissible, we evaluate the totality of the circumstances and reverse only if the trial court's finding is clearly against the preponderance of the evidence. *Day* v. *State*, 306 Ark. 520, 816 S.W.2d 852 (1991). In reviewing the trial court's denial of the suppression motion, we engage in all reasonable presumptions consistent with the ruling of the trial court. *Johnson* v. *State*, 319 Ark. 78, 889 S.W.2d 764 (1994). In determining whether a defendant's in-custodial statement was spontaneous, we have focused on whether it was made in the context of a police interrogation, meaning direct or indirect questioning put to the defendant by the police with the purpose of eliciting a statement from the defendant. *Scherrer*, 294 Ark. 287, 742 S.W.2d 884.

In this case, the roadside confession was not made in response to any of Blankenship's "general information-gathering type" questions. At the time the confession was made, Blankenship's questions had ended. Appellant initiated the brief roadside conversation which culminated in his confession when he asked Blankenship to identify himself as the sheriff. We view Rain-

bolt's query — "What did you say?" — to appellant after his confession to Blankenship as a neutral inquiry intended to clarify what had already been said and therefore a continuation of appellant's confession. *See Berna* v. *State*, 282 Ark. 563, 568, 670 S.W.2d 434, 437 (1984), *cert. denied*, 470 U.S. 1085 (1985) (quoting *Innis*, 446 U.S. 291: "[A] voluntary in-custody statement does not become the product of an 'in-custody interrogation' simply because an officer in the course of appellant's narration, asks defendant to explain or clarify something he has already said voluntarily.").[4]

■ There is no evidence that appellant, an 18-year-old high school graduate, was coerced or compelled to confess. Appellant's confession was made within three minutes of the time he was stopped on U.S. Highway 65. Although several police cars were at the scene, there is no evidence that any officer other than Blankenship and Rainbolt approached or questioned appellant prior to the time he made his confession. The police inquiry was appropriate under the circumstances and was free of the use of any mental or physical punishment. On this record, we do not find that the preponderance of the evidence is clearly against the trial court's finding that the roadside confession was spontaneous.

Appellant's clearly stated argument to the trial court at the January 25, 1993 evidentiary hearing for suppression of his post-arrest confession at the police station was that the station-house confession was "the fruit of the illegal questioning at the crime scene." In support of his motion, appellant submitted a transcript of the station-house interview. The trial court denied the motion without elaboration. On appeal, appellant argues the trial court erred in not suppressing his station-house confession, as well as the physical evidence seized thereafter, because there was no dissipation of the coercive elements of the roadside confession and because, appellant alleges, the seizure of the physical evidence was the direct result of law enforcement's exploitation of the roadside confession to pressure appellant's waiver of his right to remain silent. Appellant cites *Shelton* and *Oregon* v. *Elstad*, 470 U.S. 298 (1985), in support of his argument.

---

[4]*See also* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.7(d), nn. 95-98 and accompanying text (1984 & Supp. 1991) (discussing "volunteered" statements and follow-up questioning).

■■ Appellant's argument that the roadside confession tainted the station-house confession is meritless because the roadside confession was admissible as a spontaneous utterance, *Day*, 306 Ark. 520, 816 S.W.2d 852. This case is therefore patently distinguishable on its facts from the *Shelton* and *Elstad* decisions, each of which considered the admissibility of a second confession in the situation where the defendant's first confession was ruled inadmissible due to law enforcement's failure to comply with *Miranda*. We do not discuss appellant's argument regarding the suppression of physical evidence because the abstract fails to show the substance of any corresponding objection made below.

## II. "DEATH QUALIFICATION" OF JURY

■ In his brief, appellant states in his second point for reversal that he sought to prevent death qualification of the jury on the ground that such would deny his constitutional right to a fair and impartial jury. The abstract reveals that, on November 24, 1992, appellant filed a motion to prohibit death qualification of the jury and the state's response was filed on January 4, 1993; the substance of neither is abstracted. The supplemental abstract shows that, in a pretrial hearing on January 4, 1993, appellant admitted that the issue was controlled, absent new evidence, by *Lockhart* v. *McCree*, 476 U.S. 162 (1986), and that the trial court summarily denied the motion. In his brief, although appellant concedes this issue is controlled by the *Lockhart* decision, he asserts that the Supreme Court wrongly decided that case and then adds, with no argument or citation to authority, that we may still consider the issue under the Arkansas Constitution. On this record, we find that appellant did not rely on the Arkansas Constitution below and therefore has failed to adequately present or preserve any argument for our review.

## III. INCONSISTENT VERDICT

■ Appellant states in his third point for reversal that the jury verdict convicting him of murder in the first degree should be set aside because it is inconsistent with "acquittal on the identical, higher offense of capital murder," the crime charged in the information. Appellant recites that, after the jury returned its verdict, he moved for judgment notwithstanding the verdict and for a directed verdict of acquittal on the charge of capital murder on the grounds that the jury's acquittal on the charge of

capital offense necessarily constituted acquittal on the charge of murder in the first degree because the elements of the two offenses were identical. Appellant succinctly concludes this point of appeal by stating that he "recognizes this issue is controlled by the decision in *United States* v. *Powell*, 469 U.S. 57 (1984), but asserts that decision was wrongly decided." Appellant makes no additional argument and cites no other authority to this court. On this record, we find that appellant has failed to adequately present any argument for our review.

## IV. SUPPRESSION OF KNIFE

■ Appellant states in his fourth point for reversal that he filed a pretrial motion to prohibit introduction of a knife seized from his vehicle and that, following an evidentiary hearing in which appellant and appellee presented conflicting evidence regarding the location of the knife prior to the time it was seized, the trial court denied the motion. Appellant then concedes the conflicting evidence presented an issue of credibility for the trial court's determination which is binding on appeal in the absence of an abuse of discretion, and that no such abuse can be demonstrated on the facts as presented. Appellant makes no additional argument. On this record, we find that appellant has failed to adequately present any argument for our review.

## COMPLIANCE WITH RULE 4-3(h)

In accordance with Ark. Sup. Ct. R. 4-3(h), the transcript has been examined for prejudicial errors objected to by appellant but not argued on appeal and we conclude no such errors occurred.

The judgment is affirmed.

NEWBERN and ROAF, JJ., dissent.

ANDREE LAYTON ROAF, Justice, dissenting. I do not agree that the roadside confession of Stone constituted a spontaneous statement which was not made in response to the questioning by the sheriff.

Certainly it was an in-custodial statement. The sheriff testified that there was a "big cluster" of other police vehicles in on the stop of Stone. Even though the officers were prepared to follow Stone as he drove his vehicle to his home, he was doing so

in response to a request by the police to search his home; a reasonable person would not have believed that he was free from custody of the police under the circumstances. See *Stansbury* v. *California*, 511 U.S.___, 128 L. Ed. 2d 293 (1994); *Berkemer* v. *McCarty*, 468 U.S. 420 (1984).

The thrust of the questions posed by the sheriff — "What were you doing last night?. . . Can we go out to your house and look at your clothes from last night . . . can we look in your trunk?" made it clear that the sheriff suspected appellant was personally implicated in the killing of his co-worker. It was not mere "general informational-gathering type" questioning as characterized by an officer involved, but constituted interrogation for the purposes of *Miranda*. See 1 W. LaFave, *Criminal Procedure*, § 6.7(b) (1984, 1991 Suppl.)(and cases cited therein). Nor, therefore, could I say that appellant's responses, "Are you Sheriff Blankenship? I'm the one you're looking for, I stabbed David," were spontaneous statements or were unconnected to the questions posed by the sheriff immediately prior to this confession.

The majority further misconstrues *Miranda* v. *Arizona*, 384 U.S. 436 (1966) as holding any volunteered statement to be admissible, and wrongly concludes it is not necessary to resolve whether appellant was subjected to custodial interrogation in this instance. In fact, the directive of *Miranda* is that *custodial* interrogation must be preceded by the requisite warnings, because of its inherently coercive nature. Under *Miranda*, voluntary and spontaneous statements are admissible if made during custody, but not during custodial interrogation. *Miranda* states:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily *without any compelling influences* is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of counsel, *but whether he can be interrogated.* There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires

to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

In this case, to say that the police engaged in custodial interrogation but the suspect's response was spontaneous and voluntary, allows an impermissible contradiction to arise from the *Miranda* holding. As stated in LaFave, *supra*, at §6.7(b):

> Because *Miranda* found only *custody-plus-interrogation* coercive, a statement may qualify as "volunteered" even though made by one in custody [but where it did not also stem from interrogation]. . . .

*Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985), is also factually close to this case, and while the majority states the facts of *Shelton*, it fails to distinguish it from this case; indeed, the facts in this case are *stronger* than in *Shelton* for finding the police conduct constituted interrogation. The suspects in both *Shelton* and this case had been apprehended and surrounded by the police. In *Shelton*, the suspect ended up in a police car with the interrogating officer; in this case, the suspect was outside his own car, but was surrounded by a number of police cars and policemen. We found the situation custodial in *Shelton* and it is clearly custodial here.

In *Shelton* very little was said to the suspect before he blurted out the incriminating statements. The officer had stressed the seriousness of the crime to the suspect and told him that if he knew anything about it or could help locate either suspect, he should talk to them. At that point the suspect blurted out, "We did it. We were there." We found the policeman's questions to be interrogation and the suspect's resulting statements inadmissible.

In the case before us there was more than just a general request for information as in *Shelton*. The questions were more pointed and focused on appellant's possible implication in the crime. Here, after appellant acknowledged he knew the crime had occurred, he was asked the following questions as he was surrounded by policemen and police cars: Why was he driving so fast; what had he been doing the night before; what side of the Satterfield building [the murder scene] had he been the night before; could the police look over his house; could they look at

the clothes he had worn the night before; and could they look in the trunk of his car.

Based on the facts in *Shelton* and those in this case, I must conclude the questioning in this case constituted interrogation for purposes of *Miranda*. Appellant's statements could not be considered spontaneous and voluntary under these circumstances and were inadmissible.

Appellant's subsequent confession made at the police station within an hour of his roadside stop should also be suppressed, even though appellant was given *Miranda* warnings and executed the proper waivers prior to this confession. When the original confession has been made under illegal influence, such influence will be presumed to continue unless the contrary is clearly shown. See *Shelton supra* at 331.

Here, as in *Shelton*, there was not "sufficient dissipation of the coercive elements of the first confession" to render the second admissible.

I would reverse.

NEWBERN, J., joins in this dissent.