Robert L. FAIRCHILD *v.* STATE of Arkansas

CR 01-856 76 S.W.3d 884

Supreme Court of Arkansas
Opinion delivered June 6, 2002

*John W. Cone*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Robert L. Fairchild appeals the order of the Jefferson County Circuit Court convicting him of attempted capital murder and possession or use of a weapon by an incarcerated person. Appellant raises two points for reversal: (1) there was insufficient evidence supporting his conviction on the attempted capital murder charge; and (2) the trial court erred in denying his motion to suppress statements made to a corrections officer. As Appellant was sen-

tenced to a term of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

On the evening of June 17, 1999, Appellant was involved in an altercation with James Cannon. At that time, Appellant was an inmate in the Arkansas Department of Correction's Tucker Maximum Security Unit, and Cannon was a correction's officer at the prison. Appellant was transferred to Tucker from the Cummins Unit on August 23, 1990, where he was placed in administrative segregation until February 17, 1999. He was then assigned to be a barracks' porter on April 28, 1999, meaning that he was responsible for cleaning and sweeping the barracks that housed some of the inmates.

On the night of the altercation, Cannon reported to work for the evening shift and was informed by another officer, Anthony Ward, that Appellant had come to him complaining about a disciplinary report Cannon filled out on Appellant. According to Ward, Cannon stated that he would look into the matter and then left to conduct a security check of the barracks. He entered the barracks area where Appellant was sweeping. According to Ward, who was monitoring the prisoners from a control booth adjacent to the barracks, Appellant suddenly started running toward Cannon. When Cannon turned around, Appellant began punching him in the stomach and eventually grabbed his flashlight. Thereafter, Appellant began striking Cannon repeatedly in the head with the flashlight. According to Ward, Appellant struck Cannon in the head at least ten times. When Appellant finally stopped hitting Cannon, he started to drag his body across the barracks' floor, but then dropped him and began rummaging through Cannon's pockets.

Ward requested backup assistance from other officers. The officers were initially unable to access the area where Appellant and Cannon were, because when Cannon entered the barracks he left an inner door slightly open, causing the prison's security system to automatically lock the outer door. Once a supervisor arrived with an override key, officers gained access to Cannon and Appellant. Cannon was rescued and carried to the infirmary for medical treatment.

Two of the officers who responded to Ward's request for assistance were Delma Goldman, building supervisor, and David Knott, a correction's sergeant. According to Knott, when they arrived at the barracks, he witnessed Appellant running back and forth on the second level of the barracks. Then, Appellant approached Knott and Goldman, surrendering the flashlight that he had taken from Cannon, as well as a shank that he was carrying. Appellant was then handcuffed and initially taken to the infirmary as well, but was moved to a nearby office until Cannon was transported from the infirmary. Knott then attempted to place leg restraints on Appellant and was kicked by him in this process.

When Appellant was finally taken to the infirmary for treatment of injuries sustained while being restrained, he asked to speak with Goldman. Appellant initially asked Goldman if Cannon was dead, and Goldman replied that he did not know. Appellant then stated, "I'm tired of being here. I was trying to go out like my big brother. . . . I was trying to kill him and the peckerwood wouldn't die." Appellant's reference to his "big brother" was to Barry Lee Fairchild, another inmate who was executed by the State for the capital murder of Marjorie Mason.

Cannon was transported to the University of Arkansas for Medical Sciences in Little Rock for treatment of serious head injuries. He was rushed into emergency surgery, and according to his treating physician, Dr. Mark Linskey, Cannon was initially given a twenty percent chance of survival. Linskey explained that Cannon's scalp was broken in several places, his brain was bruised and damaged, and he was in a "severe head injury comatose state." Cannon survived this brutal ordeal, but suffered permanent damages as a result of his injuries. Doctors had to remove a portion of his brain in order to facilitate the brain's healing process. This damaged some of Cannon's cognitive abilities, leaving him sometimes unable to control his normal social inhibitions, which, in turn, causes uncontrollable and inappropriate outbursts. Cannon is also no longer able to see out of his right eye, and the left side of his body is extremely weak. He must walk with a cane, but fatigues easily and thus relies mostly on a wheelchair. He also requires assistance in completing daily living tasks.

Appellant was charged with one count each of attempt to commit capital murder; aggravated robbery; battery in the second degree; and possession or use of a weapon by an incarcerated person. A jury trial was held on November 21, 2000. During a recess in the trial, the court held a *Denno* hearing to consider Appellant's pretrial motion to suppress. The motion sought to exclude the statements Appellant made to Goldman in the infirmary following his attack on Cannon. According to Appellant, the statements were inadmissible because he was not advised of his *Miranda* rights, despite the fact that he was in custody at the time the statements were made; he did not knowingly and intelligently waive his right against self-incrimination; and the statements were not made voluntarily.

At the *Denno* hearing, Appellant presented the testimony of Goldman in an attempt to prove that the statements were the result of a custodial interrogation. Goldman testified that he had known Appellant for several years and that the two "were as close, I think, as an officer could be to an inmate." Goldman stated that Appellant had been seen by the infirmary staff and while waiting for further treatment, Appellant asked Goldman if he could speak with him. Goldman then removed the handcuffs that had been placed on Appellant following the altercation with Cannon. When questioned as to why he removed the handcuffs, Goldman responded:

> We had just had a major incident. And inmates in the infirmary are required to be placed in handcuffs, but this inmate had made a request that he wanted to speak with me. And I thought that he would probably say something to me that would shed some light on the incident. And I thought that if I removed the handcuffs he would open up and probably say more than he would if he had remained in handcuffs.

Goldman then stated that Appellant made the statements about trying to kill Cannon and wanting to go out like his big brother. Goldman reiterated that Appellant made his statements without any questioning or encouragement on his part. Goldman admitted that he did not advise Appellant of his *Miranda* rights, and that Appellant was not free to leave the infirmary at the time that he made the incriminating statements. Goldman also stated, how-

ever, that he was not trying to investigate Appellant at the time the statements were made. He only asked him why he had done it in response to Appellant's incriminating statements. Goldman also explained that the Arkansas State Police were called in that night to investigate the incident.

Goldman was the only witness to testify at the *Denno* hearing. Appellant did not testify, or put on any evidence regarding the events that occurred after the officers subdued him. The State argued that there was no *Miranda* violation because there had been no custodial interrogation. The State contended that the statements were spontaneously made and voluntary on Appellant's part. The trial court agreed, ruling that the statements were admissible because they were initiated by Appellant.

During Appellant's trial, witnesses recounted the events leading up to and surrounding the altercation. Goldman testified to the statements Appellant made in the infirmary. Officers Knott and David Westbrook, both of whom were involved in subduing Appellant after the altercation, testified that they were present in the infirmary when Appellant made the incriminating statements. Each of them testified that they heard Appellant state that he was trying to kill Cannon and go out like his brother.

At the close of the State's case, Appellant moved for a directed verdict on each of the charges. The court directed a verdict in Appellant's favor on the charges of battery in the second degree and aggravated robbery. As to Appellant's argument that the State had failed to make a *prima facie* showing of premeditation and deliberation, the trial court disagreed and denied his motion on that charge, as well as on the weapons charge. The defense rested without putting on any evidence, and the case was submitted to the jury. The jury subsequently rendered a guilty verdict on the two remaining charges, and Appellant was sentenced to a term of life imprisonment. This appeal followed.

### Sufficiency of the Evidence

For his first point on appeal, Appellant argues that it was error for the trial court to deny his motions for a directed verdict, as there was insufficient evidence to establish that he acted with

premeditation or deliberation. Specifically, Appellant argues that if the incriminating statements made in the infirmary are excluded, as argued in his second point on appeal, there is no evidence to support the attempted capital murder charge. We disagree.

We are mindful of the well-established standard of review in cases challenging the sufficiency of the evidence. This court treats a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001); *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.*; *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999).

Pursuant to Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997), a person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person." This court has held that premeditation is not required to exist for any particular length of time. *Branscum*, 345 Ark. 21, 43 S.W.3d 148; *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899, *cert. denied*, 528 U.S. 933 (1999). It may be formed in an instant and is rarely capable of proof by direct evidence, but must usually be inferred from the circumstances of the crime. *Bangs*, 338 Ark. 515, 998 S.W.2d 738; *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997). Similarly, premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature, extent, and location of the wounds,

and the accused's conduct. *Sanders v. State*, 340 Ark. 163, 8 S.W.3d 520 (2000).

■ Here, the State presented evidence that Appellant was upset with Cannon prior to the altercation. Ward testified that Appellant approached him and complained that Cannon had written a disciplinary against him. Appellant stated that he wanted Cannon to get rid of the disciplinary and leave him alone. Shortly after this discussion with Ward, Appellant attacked Cannon. Appellant used the flashlight that he grabbed from Cannon to inflict repeated blows to Cannon's head. The jury also heard testimony that Appellant was armed with a shank, a type of homemade weapon, at the time of the attack. Moreover, the vicious nature of the attack alone establishes premeditation and deliberation on Appellant's part. Ward testified that Appellant struck Cannon in the head at least ten times. Dr. Linskey testified about the numerous fractures in Cannon's scalp and the severe swelling of Cannon's brain. Initially, Dr. Linskey rated Cannon's chance of survival at only twenty percent.

■ In *Mulkey v. State*, 330 Ark. 113, 952 S.W.2d 149 (1997), this court recognized that a jury could reasonably infer from the numerous blunt-force injuries to the victim's head that the defendant had acted with the purpose of causing the victim's death. Likewise, in the present case, this jury could infer from the repeated blows inflicted on Cannon and the severe blunt-force injuries to his head that Appellant acted with premeditation and deliberation when he attempted to murder Cannon.

■ ■ Moreover, the jury's verdict was supported by sufficient direct evidence in the form of Appellant's incriminating statement that he tried to kill Cannon. As we will discuss in point two, these statements were properly admitted at trial. All of the foregoing evidence, viewed in a light most favorable to the State, supports the jury's determination that Appellant acted with premeditation and deliberation when he attacked Cannon. Therefore, Appellant's argument that there was insufficient evidence to sustain his conviction is without merit.

*Motion to Suppress*

For his second point on appeal, Appellant argues that the trial court erred in denying his motion to suppress the statements he made to Goldman in the infirmary, because he was in custody at the time the statements were made, but was not advised of his *Miranda* rights prior to making those statements. Appellant further argues that a custodial statement is presumptively involuntary, and the State failed to bear its burden of proving that his statement was given voluntarily. The State counters that the statements were spontaneous and voluntary, and not the product of a custodial interrogation. Thus, according to the State, Appellant's statement was admissible. We find no merit in Appellant's argument on this point.

In reviewing a trial judge's ruling on a motion to suppress, we make an independent determination based upon the totality of the circumstances, viewing the evidence in a light most favorable to the State, and we reverse only if the ruling is clearly against the preponderance of the evidence. *Bunch v. State*, 346 Ark. 33, 57 S.W.3d 124 (2001); *Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998). The credibility of witnesses who testify at a suppression hearing about the circumstances surrounding the appellant's in-custody confession is for the trial judge to determine, and we defer to the trial judge's superior position in determining matters of witness credibility. *Id.*

As an initial matter, we address the State's argument that Appellant, although in prison at this time, was not in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), and thus, it was unnecessary to advise Appellant of his rights. This argument is wholly without merit. This court has defined "in custody" as a person being deprived of his freedom of action by formal arrest or restraint on freedom of movement to a degree associated with a formal arrest. *See Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996). The record reflects that Appellant was in the prison's infirmary, surrounded by four officers, and was not free to leave; thus, there can be no dispute that Appellant was in custody at the time he made the incriminating statements to Goldman.

Having determined that Appellant was in custody at the time he made the incriminating statements, we now turn to our well-established principles regarding custodial statements. We have held that an accused's statement made while in custody is presumed involuntary, and the State bears the burden of proving by a preponderance of the evidence that it was given voluntarily and was knowingly and intelligently made. *Brown v. State*, 347 Ark. 44, 60 S.W.3d 422 (2001); *Barcenas v. State*, 343 Ark. 181, 33 S.W.3d 136 (2000); *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998). "[W]henever the accused offers testimony that his confession was induced by violence, threats, coercion, or offers of reward then the burden is upon the state to produce all material witnesses who were connected with the controverted confession or give adequate explanation for their absence." *Smith v. State*, 254 Ark. 538, 542, 494 S.W.2d 489, 491 (1973). *See also Brown*, 347 Ark. 44, 60 S.W.3d 422; *Foreman v. State*, 328 Ark. 583, 945 S.W.2d 926 (1997); *Griffin v. State*, 322 Ark. 206, 909 S.W.2d 625 (1995); *Remeta v. State*, 300 Ark. 92, 777 S.W.2d 833 (1989); *Williams v. State*, 278 Ark. 9, 642 S.W.2d 887 (1982); *Earl v. State*, 272 Ark. 5, 612 S.W.2d 98 (1981); *Bushong v. State*, 267 Ark. 113, 589 S.W.2d 559 (1979), *cert. denied*, 446 U.S. 938 (1980); *Gammel v. State*, 259 Ark. 96, 531 S.W.2d 474 (1976); *Russey v. State*, 257 Ark. 570, 519 S.W.2d 751 (1975); *Northern v. State*, 257 Ark. 549, 518 S.W.2d 482 (1975); *Smith v. State*, 256 Ark. 67, 505 S.W.2d 504 (1974). A defendant's failure to specifically raise the issue in the trial court or on appeal does not relieve the state of its burden to produce all material witnesses. *See Brown*, 347 Ark. 44, 60 S.W.3d 422; *Smith*, 256 Ark. 67, 505 S.W.2d 504. In *Brown*, this court stated:

> [W]e held in the earlier *Smith* case that, whenever the accused introduced evidence of coercion, the burden of the state could only be met by calling all material witnesses or giving adequate explanation for the absence of any who did not testify. Nowhere in *Smith* does it appear that, in making an objection based upon a contention the state has failed to show a statement is involuntary, a defendant must point out, in precise words, that a material witness was not called.

*Id.* at 50, 60 S.W.2d at 426-27 (quoting *Smith*, 256 Ark. at 70, 505 S.W.2d at 507-08).

In the instant action, Appellant contends that the State failed to meet its burden of proof in the *Denno* hearing. Although Appellant does not specifically argue that the State failed to meet its burden to produce all the witnesses to the statement or explain their absence, we will address this issue in accordance with the long-standing ruling first announced in *Smith*.

 Here, the trial court held the *Denno* hearing after the trial of this matter had begun. Goldman was the only witness to testify at the hearing, despite the fact that Knott and Westbrook were both present at the trial and both testified that they heard Appellant make the incriminating statement to Goldman. While we agree with Appellant that the State bears the burden of producing all material witnesses, it is also well established that such a burden does not arise where there is no evidence to controvert. *See Tanner v. State*, 259 Ark. 243, 532 S.W.2d 169 (1976); *Gammel*, 259 Ark. 96, 531 S.W.2d 474 (1976); *Smith*, 256 Ark. 67, 505 S.W.2d 504. In *Tanner*, this court explained that the requirement that the State produce all material witnesses connected with a controverted confession was in place because otherwise the evidence regarding threats, coercion, or promises of leniency would stand uncontroverted. Here, there was no such evidence to stand uncontroverted.

 Goldman's testimony centered on the fact that Appellant asked to speak with him and made the incriminating statement spontaneously. At the beginning of his testimony, Goldman explained that Appellant had been handcuffed and taken to an office until Cannon was removed from the infirmary. Goldman also stated that Appellant asked to speak with him in the infirmary after he had been treated by the staff. There was no testimony presented to indicate that Appellant made the incriminating statement as a result of violence, threats, coercion or offers of reward. In fact, Appellant did not testify at the *Denno* hearing and made no allegations regarding the taking of his statement. Moreover, even in his motion to suppress, Appellant simply states that his statement was the "result of coercion, physical intimidation, and/ or unauthorized promises of leniency[.]" There was no specific evidence submitted to support this assertion. In *Gammel*, 259 Ark. 96, 531 S.W.2d 474, this court refused to extend the require-

ment that the State produce all material witnesses where there was no testimony to refute. Likewise, we refuse to extend the requirement in this case, as there was no testimony from Appellant or any other witness that his statement was the result of coercion, threats, or promises of leniency. In sum, the State was not obligated to produce Knott and Westbrook or explain their absence. Notwithstanding, we cannot ignore the fact that both of these witnesses were present at the proceeding and were available to testify about the confession.

Our inquiry does not end here, however. The next issue to be resolved is whether Appellant's statement was spontaneous or the result of a custodial interrogation. It is well settled that a suspect's spontaneous statement, although made in police custody, is admissible against him. *Whitmore v. State*, 296 Ark. 308, 756 S.W.2d 890 (1988); *Scherrer v. State*, 294 Ark. 287, 742 S.W.2d 884 (1988). Where the statement was spontaneous, it is irrelevant whether the statement was made before or after *Miranda* warnings had been issued, and whether the defendant was in custody at that point. *See Weber v. State*, 326 Ark. 564, 933 S.W.2d 370 (1996); *Stone v. State*, 321 Ark. 46, 900 S.W.2d 515 (1995); *Ward v. State*, 308 Ark. 415, 827 S.W.2d 110 (1992). A spontaneous statement is admissible because it is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *Stone*, 321 Ark. 46, 900 S.W.2d 515. As we pointed out in *Stone*, the *Miranda* Court itself recognized this rule of law when it stated: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.* at 53, 900 S.W.2d at 519 (quoting *Miranda*, 384 U.S. at 478).

In determining whether a defendant's custodial statement was spontaneous, this court focuses on whether it was made in the context of a police interrogation, meaning direct or indirect questioning put to the defendant by the police with the purpose of eliciting a statement from the defendant. *Stone*, 321 Ark. 46, 900 S.W.2d 515; *Scherrer*, 294 Ark. 287, 742 S.W.2d 884. In *Weber*, 326 Ark. 564, 933 S.W.2d 370, this court referred to the United States Supreme Court's discussion of what constitutes an interrogation:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 569, 933 S.W.2d at 373 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Similarly, this court has stated that a statement made voluntarily while in custody does not become the product of a custodial interrogation where an officer asks the defendant to explain or clarify something he already said. *Stone*, 321 Ark. 46, 900 S.W.2d 515.

■ Here, Goldman testified that Appellant asked to speak with him and that he made the incriminating statements without prompting or questioning by Goldman. The evidence indicated that the two men had known each other for some time and had developed a close relationship. Goldman stated that he believed that Appellant trusted him. Goldman did not ask Appellant any questions until after Appellant made the incriminating statements. Goldman also testified that he was not investigating Appellant at the time the statements were made, and, in fact, the State Police were brought in that evening to conduct the investigation. The fact that Goldman removed Appellant's handcuffs is of no consequence when Goldman did not question Appellant in an attempt to elicit incriminating statements. In sum, it was not necessary for Goldman to advise Appellant of his *Miranda* rights, as his statements were not the product of a custodial interrogation. Accordingly, we cannot say that the trial court abused its discretion in denying Appellant's motion to dismiss.

*Rule 4-3(h) Review*

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the transcript of the record before us has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no reversible errors were found. Accordingly, the judgment of conviction is affirmed.